# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

BRAD EVERS,

   Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

   Defendant.

No. C09-4018-MWB

**REPORT AND RECOMMENDATION**

---

## I.  INTRODUCTION

The plaintiff Brad Evers seeks judicial review of a decision by an administrative law judge ("ALJ") denying his applications for disability insurance ("DI") benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 *et seq.*  Evers claims the ALJ erred in analyzing his Global Assessment of Function (GAF) scores, failing to give appropriate weight to the opinions of his treating doctors, failing to examine the vocational expert adequately, and discounting his credibility.  (Doc. No. 11)

## II.  PROCEDURAL AND FACTUAL BACKGROUND
### A.  Procedural Background

On July 11, 2003, Evers filed applications for DI and SSI benefits, alleging a disability onset date of April 1, 2002.  (R. 99-101; *see* R. 22)  His applications were denied initially and on reconsideration.  (R. 44-47)  Evers requested a hearing on January 29, 2004 (R. 63), but on March 7, 2005, he withdrew his request for hearing (R. 80), and on March 22, 2005, the request for hearing was dismissed.  (R. 41-43)

On May 16, 2005, Evers protectively filed new applications for DI and SSI benefits, again alleging a disability onset date of April 1, 2002. (R. 123-29) Evers claims he is disabled due to depression and anxiety that affects his ability to concentrate and his desire to look for and maintain employment. (R. 131)

Evers's applications were denied initially and on reconsideration. Evers requested a hearing, and a hearing was held on November 5, 2007, before an Administrative Law Judge ("ALJ"). (R. 594-616) Evers was represented at the hearing by attorney Philip Reiton. Evers testified at the hearing, as did Vocational Expert ("VE") Kathryn Schrot, and a Medical Expert ("ME"), psychologist James Felling, Ph.D. On January 25, 2008, the ALJ found that Evers is capable of returning to his past relevant work as an assembler, and he therefore is not disabled. (R. 22-33) Evers appealed the ALJ's ruling, and on February 9, 2009, the Appeals Council denied his request for review (R. 9-13), making the ALJ's decision the final decision of the Commissioner.

Evers filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 3) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. Evers filed a brief supporting his claim on July 22, 2009. (Doc. No. 11) The Commissioner filed a responsive brief on October 19, 2009 (Doc. No. 14). The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Evers's claim for benefits.

### B. Factual Background

#### 1. Introductory facts and Evers's hearing testimony

Evers was forty-two years old at the time of the hearing. He lived in Mountain Lake, Minnesota, with his wife. He drove a van with an automatic transmission from his

home to the hearing location.  He has a restriction on his license requiring him to wear glasses.  (R. 597-600)  He generally drives less than 100 miles in a typical week.  (R. 601)  He spends most of his time at home because he does not like to be out in public.  (R. 600)  He attends church but no other regularly-scheduled events or functions.  He watches three or four hours of television a day, reads for about an hour, and visits friends about once a week.  (R. 601-02)  About twice a week, he goes to the library and uses the computer to check his email.  (R. 611)  He occasionally goes to a local club to do karaoke.  (*Id.*)  He smokes about a pack of cigarettes a day, and does not drink alcohol.  (R. 603)

Evers did poorly in school and was in special education classes.  He repeated one grade.  (R. 607)  He stated the problems leading to his disability claim include "[d]epression, anxiety, ADHD, [and] concentration problems."  (R. 598)  His doctors have prescribed medications for him that help "[t]o a degree," making it easier for him to live with his symptoms.  (R. 599)  He has sleep apnea that causes him to have difficulty falling asleep, and then staying asleep for more than two to three hours at a time.  He awakens numerous times during the night with apnea episodes.  (R. 599-600, 609)

By the time of the ALJ hearing, Evers was not helping out around the house.[1]  He stated he has "bad shoulders and due to [his] diabetes . . . two bad elbows."  (R. 600)  He has had "[n]erve impingement surgeries," causing his arms to hurt all the time, and his hands to hurt and be numb.  (R. 600-01)  As a result, he is unable to lift without pain.  (R. 601)  Doctors gave him some exercises to do for his shoulders, but Evers stated they did not help him.  (R. 603)

Evers estimated he last worked in 2000 or 2001.  The ALJ noted Evers had had a lot of different types of jobs, and Evers stated there was no particular reason for this.  (R. 603-04)  From 1995 to early 2001, Evers worked as a cashier at a gas station, and a

---

[1]Records from a psychological exam in September 2003 indicate Evers previously took an active role in household duties and child care.  (*See* R. 323)

3

machine operator, frame bender, and assembler at a factory. (R. 141) He indicated the longest he ever held a job was about a year, when he worked as a frame bender at a factory from October 1996 to November 1997. He once held a job for only one month. He stated he will get bored with a job and quit, or he might be criticized by a supervisor and "just walk off." (R. 141, 607-08) He stated he "can't take" criticism. (R. 608)

Evers has anxiety attacks several times a day, with each attack lasting five to ten minutes. When he has an anxiety attack, he suffers chest pains, sweats, and sometimes has headaches. He cannot identify any particular trigger for the attacks, and he even has anxiety attacks when he is at home. He also has frequent mood swings, and being out in public around a lot of people makes him nervous. He has low self-esteem, has problems with fatigue and lack of energy, and feels "really down" frequently during the day. He has problems with concentration and is easily distracted, and he stated his wife has to remind him to take care of his personal hygiene. (R. 608-09) He has had thoughts of suicide at times, but has never had a plan, and doctors have increased his antidepressant dosages to address these thoughts. (R. 605-06) He has difficulties with both short-term and long-term memory. (R. 606) He gets along with people reasonably well, but he is bothered by crowds and noise. He also has problems with humidity. He has some hearing difficulties and wears hearing aids in both ears. (*Id.*)

Evers estimated he could walk for about ten minutes and stand for ten to fifteen minutes before having to stop and rest. He can bend at the waist. He has had knee surgery that affects his ability to stoop and squat. He can use his hands and fingers, but he has numbness in them and drops things frequently. He can dress himself. He estimated he can lift about twenty pounds without difficulty. He can remain seated for a couple of hours before having to get up. (R. 604-05)

## 2.    *Relevant medical history*

Evers's relevant medical history of record begins in July 2001, when he was seen for psychiatric medication management.  At that time, he was being treated with Serzone for depression, Adderall for ADHD, and Xanax for anxiety.  His condition was noted to be stable, with no evidence of psychosis or mania, no suicidal thoughts, and no acute stressors.  He had a GAF of 72, and "no exacerbated symptoms of anxiety, depression, etc."  (R. 286)  On January 31, 2002, Evers continued to report no significant symptoms of anxiety or depression.  He was eating and sleeping well.  His GAF continued to be 72.  (R. 282-83)  He asked to discontinue taking Serzone, and requested that he not be started on any other antidepressant.  Notes indicate Evers had never had "any symptoms severe enough to lead to inpatient psychiatric hospitalization for anxiety or depression."  (R. 283)  He was cautioned that as he decreased his Serzone dosage, he could have a recurrence of symptoms, and he was instructed to call if he had any significant worsening of depression or suicidal thoughts.  The doctor opined that Evers might be "physiologically dependent on Xanax," although he did not have any of the typical symptoms and he was not abusing Xanax.  (*Id.*)

On June 25, 2002, Evers reported that he had been feeling depressed again for six weeks, "[e]vidently . . . precipitated by his divorce proceeding that ha[d] been initiated a few months ago."  (R. 279)  His GAF was assessed at 66.  He asked to get back on an antidepressant, and he was prescribed a trial of Zoloft.  The doctor noted, "I did offer [Evers] individual psychotherapy, which I feel is important . . . in this case because of his ongoing stresses, but he has refused that."  (R. 280)

On September 12, 2002, Evers was evaluated by Jerome J. Perra, M.D. for complaints of left hand numbness and left elbow pain.  The doctor diagnosed him with ulnar neuritis and possible wrist entrapment.  "He was fitted with a large elbow pad and was advised to avoid resting his elbow on tables or arm rests."  (R. 406)  Anti-

inflammatories were recommended, and the doctor ordered nerve conduction studies. (R. 406-07) Evers returned to see the doctor on September 19, 2002, complaining of increasing pain in his left forearm and hand. The doctor recommended "a short course of oral steroids to try to decrease the local irritation and inflammation." (R. 405) Notes indicate that Evers was not currently working, "but if he were, he would be at restriction of no gripping or grasping or repetitive pushing or pulling activities." (*Id.*)

On September 23, 2002, Evers underwent a peripheral nerve conduction study of his left upper extremity in connection with his complaints of left hand numbness and pain. The study "was normal with the exception of mildly delayed sensory latencies across the wrists segment of the left median nerve," which findings were noted to be "compatible with a mild left median nerve entrapment at the wrist (<u>mild</u> left carpal tunnel syndrome)." (R. 415; emphasis in original) Evers saw Dr. Perra for follow-up on October 3, 2002. The doctor recommended an EMG of his left upper extremity, and he restricted Evers to no repetitive fine detail or repetitive gripping or grasping, and no manual labor with his left hand. He noted Evers could "still do right handed activities and use his left hand for assistance." (R. 404)

On October 28, 2002, Evers underwent an EMG/Nerve Conduction Study which resulted in findings of "[p]robable mild left ulnar neuropathy with decrease in amplitude across the elbow and mild denervation of the FDI," and "[m]inimal left median neuropathy with slowing across the wrist consistent with carpal tunnel syndrome." (R. 411)

On October 31, 2002, Evers returned to see Dr. Perra for follow-up of "left arm pain and tingling to the small, ring, and long fingers." (R. 402) Evers stated his symptoms were worsening, and he was experiencing burning pain in his arm and elbow, as well as pain and intermittent numbness of his fingers. The doctor recommended a trial of "a neuroleptic agent such as Neurontin for a period of 4 to 6 weeks before considering any other interventions." (*Id.*) Notes indicate Evers "asked about work restrictions," and

the doctor indicated Evers would be unable "to maintain a job with heavy gripping activities or prolonged grasping because of his symptoms. [He gave Evers] a list of some restrictions, but . . . he could do a job that involves occasional reaching and grasping. Clerical jobs, check-out type jobs should be considered." (*Id.*)

Later the same day, Dr. Perra noted the following in Evers's medical records:

> I received a call from Kendra Moose who is Brad Evers' job counselor. She asked for some clarification of his job restrictions so she can help him seek employment. We discussed the above limitations. The patient brought back another copy of his work restrictions requesting that he be kept completely off work because he is having a hard time finding work with these restrictions. I do not believe total restriction from work is appropriate at this time.

(R. 403)

On November 7, 2002, Evers was seen at Southwestern Mental Health Center in Windom, Minnesota, for an intake evaluation. He indicated he had been driving to New Ulm, Minnesota, for treatment, and he was looking for a doctor closer to his home to treat him for anxiety, ADD, and depression. Notes indicate that when Evers was "asked specifically what [was] wrong with him, he state[d] he gets frustrated easily, can't keep his concentration, therefore, he can't hold a job. He's been unemployed for two years [and has] never been employed for more than one year at anyone [sic] time. . . ." (R. 331) Lyle P. Christopherson, D.O., the psychiatrist who interviewed Evers, noted the following from his mental status exam:

> This 37 year old, obese white male is somewhat anxious and shy with medium eye contact. He was somewhat restricted when the interview first begins, but he does loosen up as the interview progresses. He tends to have a lot of denials and tends to projectives, various aches and pains and a variety of circumstances including his ex-wife. He is angry at the surgeon for not supporting him in what he feels is a disability. He demonstrated no evidence of active hallucinations, does

claim to be somewhat depressed and does state that the Zoloft works better than the Serzone.  He does complain of sexual dysfunction.  When asked about sleep, he states he sleeps fine but his girlfriend states she hears him gasping for air.  He apparently has a brother with sleep apnea and he may have it also.  He has always been big structured, but states he was really heavy a year and a half ago.  He states he has lost 80 pounds in dieting secondary to diagnosis of Diabetes.  He does enjoy some things in life.  He worries about appropriate things, no money, lots of bills, his future.  He does have a form he wants filled out for disability.  His energy level was impaired, concentration has always been impaired.  He was always in Special Education classes.  Mild psychomotor retardation.  He did have suicidal thoughts back during his divorce.  Denies them at this time.  No evidence of psychotic thought processes.  No evidence of hallucinations or delusions.

(R. 332) Dr. Christopherson diagnosed Evers with Depression, NOS; Generalized Anxiety Disorder; Previous Diagnosis of ADD; Rule out Mood and Anxiety Disorder secondary to sleep apnea; Dependent Personality Traits, Avoidant Features; Questionable Sleep Apnea; orthopedic problems with his shoulders; Impingement of the Ulnar Nerve on the left side; Obesity; and Moderate Psychosocial Stressors; with a current GAF of 60 to 65. (*Id.*)  He switched Evers to Adderall XR.  (*Id.*)

On November 20, 2002, Evers saw his family doctor to request a sleep apnea study. He complained that he would awaken at night gasping for air.  He had smoked one to two packs of cigarettes a day for many years, but reported that he had quit smoking a couple of months earlier.  He was referred for a sleep apnea study.  (R. 294)  Notes also indicate that Evers was treated regularly for Type II diabetes.  He was doing well on Glucotrol and lost over 80 pounds between April and September 2002.  He was advised that he likely could handle his diabetes without medication if he could lose more weight.  (R. 296; *see* R. 295-97)

Evers saw Dr. Perra on December 19, 2002, for follow-up of his forearm pain and finger tingling. He stated the Neurontin had not helped him, and the pain in his arm and tingling in his fingers continued, causing him problems with "many daily activities." (R. 401) The doctor recommended Evers be evaluated by a specialist in hand surgery. (*Id.*)

Evers returned to see Dr. Christopherson on January 2, 2003. He reported "getting along fairly well," with "[]no evidence of psychotic thought processes, . . . hallucinations or delusions." (R. 330) His Adderall dosage was increased and he was directed to return in three months. (*Id.*) He saw Dr. Christopherson again on April 3, 2003, reporting that the Adderall did not seem to be working. Dr. Christopherson questioned the diagnosis of ADD, noting Evers suffers from what "seems more of a personality disorder, Cluster A avoidant type and depressed." (R. 329) Evers denied any psychotic symptoms. Buspar was added to Evers's medications, and he was switched from Adderall XR to "regular Adderall." (*Id.*)

Evers was evaluated by Lawrence T. Donovan, D.O. on January 15, 2003, in connection with his arm and hand problems. He was diagnosed with left cubital tunnel syndrome[2], status post median nerve decompression. (R. 399-400) He was scheduled for surgery, and on January 31, 2003, he underwent a surgical procedure for cubital tunnel syndrome. (R. 384-85) One week after the surgery, Evers reported that his finger numbness had resolved, and he complained of only mild elbow discomfort. He was placed in a sling, and was advised to perform range-of-motion exercises and avoid any heavy pulling. (R. 398) At his next follow-up exam, on February 26, 2003, Evers reported doing quite well, with no further complaints of numbness and no apparent distress. He was advised to increase his activities as tolerated, and follow up as needed. (R. 397)

---

[2]"Cubital tunnel syndrome is the effect of pressure on the ulnar nerve, one of the main nerves of the hand. It can result in a variety of problems, including pain, swelling, weakness or clumsiness of the hand and tingling or numbness of the ring and small fingers. It also often results in elbow pain on the side of the arm next to the chest." http://www.eatonhand.com/hw/hw007.htm (Mar. 26, 2010).

On April 8, 2003, Evers underwent a peripheral nerve conduction study of his right upper extremity. The study "revealed abnormal findings compatible with a <u>mild</u> right median nerve entrapment at the wrist (<u>mild</u> right carpal tunnel syndrome)." (R. 408; emphasis in original)

Evers saw Dr. Donovan on April 23, 2003, for evaluation of his complaints of right elbow and forearm pain. (R. 395-96) Evers related "a long history of tennis elbow," which began seven or eight years earlier. Following his examination, the doctor recommended "a course of physical therapy for iontophoresis and stretching exercises" to address Evers's tennis elbow. (R. 396) He ordered a nerve conduction study to evaluate the numbness in Evers's hand. (*Id.*)

Evers returned to see Dr. Donovan on May 7, 2003, with continued complaints of elbow and forearm pain on the right. Physical therapy had failed to improve his symptoms. The doctor diagnosed Evers with right tennis elbow, probable entrapment of the right radial nerve, and mild carpal tunnel syndrome by electrophysiologic criteria. He discussed options with Evers, who elected to go forward with surgery. (R. 393-94)

On May 20, 2003, Evers underwent "Right tennis elbow release" and "Decompression of radial nerve (posterior interosseous nerve, radial tunnel)" (R. 386-88) to address his "long history of tennis elbow." (R. 395) He had mild pain the day following surgery (R. 392), and on June 11, 2003, he reported his pain was "completely resolved," although he had "some stiffness of his elbow with extension." (R. 391) By July 23, 2003, Evers developed some increasing discomfort in his right elbow and forearm, with an "occasional clicking sensation in the elbow" with movement. (R. 390) Dr. Donovan prescribed physical therapy for two weeks. (*Id.*) On August 6, 2003, Evers reported that he was doing better with physical therapy, and he was "able to get his elbow out completely straight." (R. 389) He continued to have occasional discomfort in his forearm. He was advised "to do activity as tolerated." (*Id.*)

Evers saw Dr. Christopherson again on June 19, 2003, and reported "doing fairly well." (R. 328) His Buspar dosage was increased, and Evers had weaned himself off of Xanax at the doctor's suggestion. (*Id.*)

On September 19, 2003, Evers was seen by E. Lynn Herrick, a Licensed Psychologist, for a mental status evaluation and activities of daily living assessment at the request of the state agency. (R. 321-25) Evers drove himself to the appointment. Evers stated he was diagnosed with an anxiety disorder as a child. He lived in a group home for treatment for three months. He took special education classes, and as a teenager, he dropped out of school three times. He eventually obtained a GED, and was able to graduate with his class in 1984. He then went to a vocational-technical training school to learn radio broadcasting, but he "became involved with drinking too much and eventually withdrew and returned home." (R. 321) Over the next few years, he changed jobs frequently, and he began using marijuana. He was taking medications for anxiety, but in 1990, he was convicted of selling his prescriptions and served 90 days in jail. (*Id.*)

He was married in 1995, and fathered three children in that marriage. He was injured on the job at a window factory, but he stayed on that job for over a year due to the pending workmen's compensation litigation. He stated this was the longest he had ever held a job. He and his wife separated in 2002, and when his divorce was final in 2003, he remarried and fathered another child. (R. 321-22)

Evers described his primary problem as an "inability to concentrate." (R. 322) He is "forgetful," and "has to be reminded to change clothes and take showers by his wife." (*Id.*) Regarding his daily activities, Evers reported the following:

> **Interests:** He reports that his interests include reading, watching TV and being on the computer. According to him, he can read 2 to 3 books a week and is likely to spend long hours on his computer. At times he will not shut it off until 2 to 4 a.m. and then go to bed. Most of his computer time is spend [sic] playing games.

**Activities:** His typical day usually starts around 9/9:30 a.m. when he gets up. He will eat breakfast, take his pills and then either watch TV or get on the computer. He does respond to his wife and new child, but most of his attention is placed on his interests. He reports that he does not "remember" to do his personal hygiene tasks and has to be reminded by his wife. He eats lunch around noon and continues whatever he started in the morning. There may be some friends who are likely to drop by and visit. After having supper around 6, the family either settles in for the evening or watches TV or they may go out and visit family or friends. His wife retires early and then he goes back to his computer and stays engaged until the wee hours of the morning when he falls to sleep.

He states both his wife and he share domestic duties including cleaning, meals, laundry and caring for their child. Until his child was born, his wife was on bed rest and he did all of the activities. He reports no restriction on his ability to leave the home and he participates in the shopping. When asked about the pace of his work, he reports that the primary problem is in getting himself started. He procrastinates a great deal. He did not see any problems with his ability to function with the daily tasks of the home. There were no symptoms reported that indicated depression other than his inability to get started. Concentration seems fine with both his reading and his computer games.

**Living Situation:** He lives with his wife and children and talks about having visitors throughout the day. There was no indication that any type of restrictive environment is needed.

**Ability to Relate:** He was quite open about never having any problems with relating to his co-workers or supervisors. It was his report that he has friends that stop by and he relates well to [them]. Their involvement in his life does not seem to create any problems. He has gone through a divorce over the last 18 months, which was somewhat disputed, but was able to find another partner that resulted in a marriage shortly after the divorce became final.

> **Substance Abuse:** There was an admission that in his mid-twenties he had a problem with alcohol and marijuana. . . . He denies any current use of either alcohol or drugs other than his prescriptions, which he reports using appropriately.

(R. 322-23)

Regarding Evers's mental status, Herrick noted there was no evidence of any thought disorder, and Evers demonstrated an appropriate stream of consciousness during the interview. His memory appeared to be intact, and he did not describe any vegetative signs of depression. Although Evers reported difficulty with concentration, Herrick noted that he "admitted to reading two to three books a week and staying focused on his computer games for hours at a time." (R. 323-24) Evers reported having anxiety attacks, but stated they had not occurred for three or four months. (R. 324)

Herrick noted that Evers's "current psychiatrist has diagnosed him with a Cluster C personality disorder, specifically Mixed with dependent and avoidant," and Herrick found that "[t]he information presented suggests that he does possess these signs." (*Id.*)

Herrick made the following assessment of Evers's mental status:

> **Summary and diagnostic impression:** His presentation seemed to be genuine without any attempt to project an image and gives strong confidence that the assessment was accurate. His claim to have problems with concentration was not demonstrated during the mental status examination. He had no problems with his serial 7's. It appeared to be his admission that most of his difficulties with employment were related to loss of interest as opposed to mental health problems. He has presented a long history of psychiatric intervention involving medication monitoring dating back to late childhood. His current psychiatrist is less confident of the Attention Deficit Hyperactivity Disorder diagnosis and is more leaning to anxiety with a mixed personality disorder.
>
> His anxiety problems are connected to the history of agoraphobia. He did not endorse any daily problems with

anxiety. His Buspar is prescribed to handle the anxiety and appears to be working.

The personality disorder is determined through his report of the following symptoms: difficulty making decisions; difficulty expressing disagreement with others; difficulty in initiating projects; feeling uncomfortable at being alone; urgently seeks another relationship after the close of another one; avoids occupational activities that involve significant interpersonal interaction; inhibited in new interpersonal situations; views self as socially inept; and reluctant to take personal risks to try new activities.

(R. 324-25) Herrick diagnosed Evers with Anxiety Disorder NOS (by history), Depressive Disorder NOS, and Personality Disorder Mixed, with a current GAF of 53, and highest GAF in the preceding year of 62. She noted current stressors to be "Occupational, unable to hold a job; [and] Economical, limited income." (R. 325) She further noted Evers should be able to handle his own funds. (*Id.*)

Herrick reached the following conclusion regarding Ever's work-related mental abilities:

His mental capacity seems to be good. He was able to follow instructions well throughout the interview and he did not feel that it was difficult for him to assimilate to a new work environment. He should be able [to] retain and follow instructions. He also did not indicate that there had been any problem with his work rate. His difficulty is in the area of sustaining interest and motivation at work. It was also apparent from his responses that he was able to relate well to both co-workers and supervisors on the worksite. He gave no indication that stress from work interfered with his working ability.

(*Id.*)

On September 25, 2003, Evers returned to see Dr. Christopherson for a medication check. Evers reported that the Buspar had done nothing for him, and he requested to return to Xanax. He was excited about the birth of his new daughter. The doctor

14

discontinued the Buspar and Evers agreed to a trial of Klonopin, which the doctor noted has "less abuse potential" than Xanax. (R. 327, 374)

On October 6, 2003, Russell Ludeke, Ph.D. reviewed the record and completed a Psychiatric Review Technique form (R. 351-64), and a Mental Residual Functional Capacity Assessment form (R. 365-68). He evaluated Evers under Listings 12.04, Affective Disorders, noting Evers has complained of sleep disturbance and difficulty concentrating or thinking; 12.06, Anxiety-Related Disorders; and 12.08, Personality Disorders. He opined Evers would have a mild degree of limitation in restriction of the activities of daily living; moderate degree of limitation in difficulties maintaining social functioning, and difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation. (R. 351-64) With regard to Evers's job-related mental limitations, Dr. Ludeke opined Evers would be moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and respond appropriately to changes in the work setting. He opined Evers would have no other significant limitations. (R. 65-66) He indicated Evers "[c]an understand and retain simple 1- and 4-step tasks. Pace and persistence are adequate for that. [H]e [c]an get along with peers and supervisors and briefly with the public. [H]e [c]an adapt to occasional, mild changes." (R. 367)

Evers saw Dr. Christopherson for medication monitoring on March 18, 2004. The doctor noted the following from his mental status examination:

> [Evers] informs me that he has had 50 jobs in his lifetime and within a month he gets bored and quits or just can't concentrate and can't focus. Then he loses his job or quits the job. Therefore, he feels he is disabled. He is in the process of filing for disability and has attorneys fighting the case. He

tells me that he could not go back to work or he wouldn't get disability which is probably somewhat true. He does have odd blinking and facial gesturing. I think he could at least try to have supervised structured work. Part of the reason he doesn't stay on the job is feeling that the work is under him or is beneath him. He does have some low self-esteem. The biggest problem this fellow has is a significant personality disorder. I don't see any disabling disability. He certainly should be able to find some sort of assistance. He stated the longest time he held a job was a manufacturing job. The only reason he stayed there is because he had a disability claim, he got a repetitive injury to his elbow, but he was only there for a total of three months and did get some type of settlement from this company. I suspect there is a concern here that somebody as malicious as him it benefits society to keep him off the work force. However, he has excessive idle time and low self-esteem and would certainly benefit from getting a job including social contacts, using his time for something productive and the obvious benefits of monetary reasons. He gives an example of why he is stressed out and the example just exemplifies what happens when a fellow has way too much free time. Apparently it had something to do with him being at a gathering and something to do with a chair, he brought a chair back to his family and it was broke[n] and apparently this person cursed at him, then somebody threatened him and now he has been excessively worrying that people are following him. I pointed out to him that these are problems people get into when they have a lot of excessive free time and don't keep themselves busy. I'm not saying that it couldn't have happened if he was working. I truly don't see any reason he can't find work and stay with it. He complains bitterly of having a lot of anxiety but he is only taking 50 mgs. of Zoloft. Will increase that to 100 mgs.

(R. 373)

At Evers's next appointment, on July 29, 2004, Dr. Christopherson noted he was "somewhat aloof and less animated than he was on his last visit," and he opined Evers was "obviously still somewhat upset with this physician pertaining to my lack of support of his

disability." (R. 372) The doctor noted, "As I had told him, he is disabled because he wants to be disabled and I don't really understand why society or Social Security would need to endorse giving him Social Security Disability." (*Id.*) Dr. Christopherson noted he was leaving the clinic, and perhaps Evers could "convince the incoming psychiatrist that there is indeed some form of disability." (*Id.*)

On December 30, 2004, Evers saw Francis Koss, M.D. for medication management and diagnostic evaluation. (R. 370-71, 509-10) The doctor continued Evers on Zoloft for depression, Klonopin for anxiety, and Adderall for ADHD. Dr. Koss noted, "In regards to disability, patient does have symptomotology [sic] at this time to include anxiety which might interfere with gainful employment. Patient relates in process of appeal of his disability determination." (R. 371, 510) Dr. Koss assessed Evers's current GAF at 45-50. (*Id.*)

Evers returned to see Dr. Koss on February 3, 2005. He reported some increased stress from his pending disability action. His car had been repossessed. He reported feeling "more depressed, has sleep disturbance, increased anxiety, feels anger at times at the system, some decreased motivation, decrease[d] concentration, feels hopeless, helpless at times." (R. 383; 508) He also reported some recent auditory hallucinations. The doctor increased Evers's Zoloft dosage. He assessed Evers's current GAF at 45, and noted that "in regards to disability to [Evers's] current symptomatology of severe depression, difficulty concentrating, feeling fatigued, feeling hopeless and helpless at times with increased stressors from finances, etc. I feel patient unable to do gainful employment at this time." (*Id.*) Evers missed his next appointment for medication management scheduled for April 4, 2005. (R. 507)

Evers underwent a sleep study on April 5, 2005. The study revealed "[s]evere obstructive sleep apnea with desaturation during REM sleep, correct with CPAP 8 cm during sleep." (R. 418)

On May 20, 2005, Evers was seen for an intake evaluation by psychiatrist Roger Sparhawk, M.D. in connection with Evers's complaints of anxiety, depression, and ADHD. (R. 441-42, 573-74) The doctor reviewed Evers's past records of medication treatment and interviewed Evers, arriving at diagnoses including "[p]robable recurrent major depression, . . . currently of moderate to severe or severe degree, in the context of relationship breakup"; panic disorder and ADHD, "by history"; "[m]ixed personality features"; and a current GAF "[e]stimated at 50 with serious symptoms." (R. 442, 574) The doctor prescribed an increased dosage of Zoloft, and switched Evers from Klonopin to Xanax based on Evers's report that Klonopin was less effective in controlling his panic attacks, and caused him more sedation than Xanax. (*Id.*)

Evers saw Dr. Sparhawk for follow-up on June 10, 2005. Notes indicate Evers was "showing some improvement on the current regimen," so his medications were continued without change. His GAF was estimated to be "55 with moderate symptoms." (R. 440, 572) Evers saw the doctor again on July 15, 2005, and notes indicate he was showing "some significant improvement" on his current medications. Nevertheless, his GAF was estimated to be "50 with serious symptoms." (R. 439, 571)

On July 20, 2005, James Alsdurf reviewed the record and completed a Psychiatric Review Technique form. (R. 419-32) He found Evers to have no medically-determinable psychiatric impairment, noting Evers "gets around town, goes to the library often to read. Does some things around the house, has his kids every other weekend." He also noted Evers had not "kept any of his [appointments] with mental health practitioners, but had kept appointments with his primary care physician. (R. 431)

On July 21, 2005, Daniel Larson reviewed the record and completed a Physical Residual Functional Capacity Assessment form. (R. 456-63) He opined Evers could lift twenty-five pounds frequently and fifty pounds occasionally; and sit, stand, and/or walk for six hours in an eight-hour workday, with normal breaks. He found Evers to have no

physical limitations of any kind.  (*Id.*)  On January 4, 2006, Charles T. Grant reviewed the record and concurred in Larson's findings.  (R. 465-66)

Evers saw Dr. Sparhawk for follow-up on August 16, 2005.  He complained of "ongoing/persistent excessive daytime sleepiness despite consistently using CPAP every night."  (R. 437, 569)  He described his mood as "up and down," and he was frustrated with his life situation and his ongoing divorce proceedings.  His current GAF was estimated to be "50 with  moderate symptoms."  (*Id.*)  His medications were continued without change.  (*Id.*)

At his next appointment on September 13, 2005, Dr. Sparhawk prescribed a trial of Provigil, and decreased Evers's Adderall dosage, in an attempt to address his daytime sleepiness.  His GAF was assessed "at 50-55 with moderate to serious symptoms." (R. 435, 567)  On October 17, 2005, Evers reported that the Provigil was "helpful with his daytime alertness."  His GAF was estimated to be "50 with moderate to serious symptoms."  (R. 434)  His medications were continued without change.  (R. 433-34, 565-66)

On January 5, 2006, R. Owen Nelson, Ph.D. reviewed the record and completed a Psychiatric Review Technique form (R. 467-80), and a Mental Residual Functional Capacity Assessment form (R. 481-84).  Dr. Nelson concluded that Evers "appears to have a severe psychological impairment that does not meet/equal the listings."  (R. 479)  He noted the following regarding Evers's work-related mental abilities:

> The claimant[] retains the capacity to concentrate on, understand, and remember routine, repetitive tasks, and three and four step, uncomplicated instructions, but would have moderate problems with detailed, and marked problems with complex, instructions.

> The claimant's ability to carry out tasks with adequate persistence and pace would be intact for routine, repetitive, or three and four step tasks, but moderately impaired for detailed and markedly impaired for complex tasks.

19

> The claimant's ability to interact and get along with co-workers would not b[e] significantly impaired.
>
> The claimant's ability to interact with the public would not be significantly impaired.
>
> The claimant's ability to follow an ordinary routine would be moderately impaired, but adequate to function with the ordinary level of supervision found in most customary work settings.
>
> The claimant's ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive and a three and four step work setting.

(R. 483)

Evers saw Dr. Sparhawk for follow-up on February 3, 2006. Evers had run out of his Adderall and Provigil, and had missed appointments due to car troubles. He reported feeling more depressed since running out of his medications. He described his mood as "antsy and a little depressed." (R. 563) His GAF was estimated to be "50 with moderate to serious symptoms." (*Id.*) His medications were continued, with "a slightly higher dose of Adderall in an attempt to control the attention and concentration better." (R. 564)

Evers returned to see Dr. Sparhawk on March 8, 2006. He felt his attention span was improved and he was less fidgety with the increased Adderall dosage. His medications were listed as "helpful and well-tolerated." (R. 561) Evers continued to complain of excessive daytime sleepiness. (*Id.*) His GAF was unchanged at "50 with moderate to serious symptoms." (R. 562)

Evers next saw Dr. Sparhawk on April 5, 2006. (R. 559-60) He reported some ongoing fatigue, and stated Provigil was no longer helping for this. The Provigil was discontinued, and the doctor prescribed Wellbutrin XL, "potentially [a] more energizing antidepressant [that] might possibly either replace Zoloft or augment it." (R. 560) His GAF was unchanged at "50 with moderate to serious symptoms." (*Id.*) When Evers

returned on April 27, 2006, he felt he was somewhat improved on the Wellbutrin. His GAF also was improved at "55 with moderate symptoms." (R. 558) His medications were continued without change. (R. 557-58)

In May 2006, Evers was diagnosed with "mild to moderately severe bilateral sensorineural hearing loss." Hearing aids were prescribed. (R. 512, 516)

On May 26, 2006, Evers's Wellbutrin dosage was increased and Zoloft dosage was decreased. (R. 556[3]) Evers saw Dr. Sparhawk for medication management on June 21, 2006. He indicated his medications were helpful and well-tolerated, and they were continued without change. His GAF was estimated to be "55 with moderate symptoms." (R. 554-55) On August 31, 2006, Evers requested to lower his dosage of Wellbutrin and increase his dosage of Zoloft. He had been "down somewhat more the past 6-8 weeks," and continued to "report fairly severe attention and concentration and hyperactivity symptoms on the Barclay Questionnaire." (R. 552) His GAF was unchanged at "55 with moderate symptoms." (R. 553) The doctor changed the dosages as requested, and on November 15, 2006, Evers reported that he was doing better on those dosages. His GAF continued to be estimated at "55 with moderate symptoms." (R. 550) The doctor further deceased the Wellbutrin dosage. (R. 550-51) Evers continued to report doing well at his next visit on January 18, 2007, and his GAF was unchanged at "55 with moderate symptoms." (R. 548-49) On March 15, 2007, Evers reported that his mood was "so-so to pretty good and mostly even," and he was sleeping eight hours per night. His GAF assessment continued to be 55, and his medications were continued without change. (R. 546-47)

At Evers's medication management visit on April 12, 2007, he reported that he was seeking care closer to home. His GAF continued to be 55, and his medications were

---

[3]This is page 2 of the record from May 26, 2006. (R. 556) Page 1 does not appear in the Record.

continued without change, including Zoloft, 150 mg per day; Wellbutrin SR, 100 mg per day; Adderall, 10 mg twice a day; Xanax, 1 mg twice a day; and Glucotrol. (R. 544-45)

In June 2007, Evers began having knee pain. He was seen in the emergency room and was give a knee immobilizer and crutches. A follow-up MRI of his knee showed "abnormalities of the menisci," and degenerative changes, and he was referred to an orthopedic specialist. (R. 520-21)

On July 9, 2007, Evers was seen by a psychiatrist for medication management. His mood was noted to be euthymic, with no anxiety, and good attention and concentration. Notes indicate Evers's wife was receiving disability payments and "they basically [were] living off her disability." (R. 504) Evers stated he could function "okay" unless he was in a "really big crowd," and he reported no panic attacks. He was on crutches from a torn knee cartilage. His current GAF was estimated to be 50, and his psychiatric medications were continued without change. (R. 505)

On September 24, 2007, Evers was seen for evaluation at the clinic where he was receiving medication management. (R. 490-503) Evers's diagnoses were listed as Major Depressive Disorder, Recurrent, Moderate; and Anxiety Disorder, NOS. His current GAF was estimated at 55. (R. 490) The doctor recommended he continue with medication management, and also begin individual therapy with a focus on relaxation techniques and positive coping skills. (R. 492) Notes indicate Evers had a notable facial tic that lessened somewhat as the interview continued. (R. 493, 502)

On January 22, 2008, Evers was seen to begin individual therapy with Michelle L. Buhman-Livermore, LISW. Evers reported that his current medication regimen was working well for him. His GAF was estimated to be 55. He agreed to begin seeing the counselor for "cognitive therapy and problem-solving therapy, as well as interpersonal therapy that might help him improve his ability to communicate with friends and family." (R. 591)

Evers saw the counselor for therapy sessions on February 7 and 21, 2008. Evers reported that he had become involved in a neighborhood church as a mentor for the youth group. His medications continued to work well for him and his symptoms were stable. He was anxious and frustrated by the denial of his disability application, and fearful about his finances and the future. (R. 592-93)

### 3. Medical expert's testimony

The ME stated Evers has, "from time to time," met the A criteria for a major depressive disorder under Listing 12.04. He has a panic disorder under Listing 12.06 "by history," but the ME found no "clear elucidation of what those symptoms are" beyond Evers's hearing testimony. (R. 612) The ME further noted the record suggests Evers has a personality disorder not otherwise specified under Listing 12.09. (R. 613)

With respect to the degree of limitations that these impairments would cause Evers, the ME rated them as mild with respect to the activities of daily living, moderate with respect to maintaining social functioning, and moderate with respect to maintaining concentration, persistence, and pace, with no episodes of decompensation. (*Id.*) The ME opined Evers would be restricted to "simple, repetitive, routine kinds of tasks . . . that involve only brief and superficial contact with others." (*Id.*) The ME indicated these restrictions "would require that [Evers] be able to tolerate at least minimal amounts of stress," which is "hard to define in a work environment." (R. 614)

With regard to Evers's claim that he experiences anxiety attacks several times a day, the ME indicated that whether or not these attacks would interfere with Evers's ability to work "depends on the extent of the anxiety attacks in terms of the . . . degree to which it impairs his functioning at the time." (*Id.*) The ME observed:

> Some people have anxiety attacks that they can work through on and, and you wouldn't know that they're having them, for some other people it effects [sic] them very differently. From

the records I don't have any, the diagnosis of a panic disorder was made by history and it sounds like they felt that that was under reasonably good control over the last few years, but that's in contradiction to what [Evers] said this morning.

(R. 614-15)

### 4. *Vocational expert's testimony*

The ALJ asked the VE if Evers could return to any of his past relevant work "if he were limited to work that should not be any more exertional than light but would be simple and unskilled and superficial contact at best with the public and fellow employees, [with] minimum stress[.]" (*Id.*) The VE indicated Evers could return "[p]ossibly" to "the assembly jobs," with permitted absenteeism of one day per month. (R. 615-16) If Evers were unable to maintain "productive speed," then he "would be subject to criticism" by his supervisors. (R. 616)

### 5. *The ALJ's decision*

The ALJ found that Evers has severe impairments consisting of diabetes, sleep apnea, major depressive disorder, anxiety, and attention deficit hyperactivity disorder, the combination of which would "more than minimally" affect his ability to work. (R. 25) However, the ALJ concluded that Evers's impairments, singly or in combination, did not meet the Listing level of severity. (R. 26)

The ALJ further found, based on the ME's testimony, that Evers's panic disorder and personality disorder were not medically-determinable mental impairments. (R. 25) He further found Evers's treatment for his upper extremity numbness and pain did not result in significant work-related limitations for a twelve-month period, and therefore they also were not severe impairments. (R. 26)

The ALJ found as follows regarding Evers's GAF scores:

The record contains numerous Global Assessment of Functioning Assessments (GAF) between June 2002 and September 2007, which indicate that the claimant's difficulty in social functioning ranged between only mild difficulties to serious impairments. The claimant's GAF was assessed at 45 to 50 in December 2004 and 45 in February 25 [sic], reflecting serious impairments in social functioning. The Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. 1994) However, the GAF score as used in the DSM-IV was intended to be used for diagnostic purposes and not for making determinations related to disability. Further, these GAF assessments reflect the claimant's functioning at one point in time and do not represent the claimant's functioning over an extended time period. The record reveals that the majority of GAF assessments have ranged between 50 to 55, indicating essentially moderate limitations in social functioning. During the first year after his alleged onset date the claimant's GAF ranged between 60 and 66, reflecting only mild symptoms, and GAF assessments of 55 beginning in June 2006 reflect moderate limitations in social functioning. [Citation to exhibits omitted.] The undersigned finds that overall the claimant is subject to no more than moderate limitations in social function.

(R. 27)

The ALJ found Evers "has the residual functional capacity to perform the full range of light work, requiring lifting twenty pounds occasionally and ten pounds frequently, standing/walking six hours in an eight-hour day and sitting two hours in an eight-hour day. The claimant is limited to simple, unskilled work with superficial contact at best with the public and fellow employees." (R. 28) In reaching this conclusion, the ALJ noted he had considered third-party observations of Evers's friends, Dana Lee and Michael Alan Junker. Lee indicated on December 26, 2005, that she saw Evers three times a week for an hour or two at a time, and she had known him for two years. She noted Evers "doesn't care what he looks like" and "needs to be reminded" to bathe, shave, and care for his hair. (R. 259-60) She indicated Evers picks up his residence, but he needs prompts to complete

tasks, and cleaning the apartment will take him several days.  (R. 260)  She noted Evers "does not like to be alone, or in public for a long time."  (R. 262)  He goes to church and out to coffee with friends one to three times a week.  According to Lee, Evers's "arms and hands go numb a lot, [and] depression effects [sic] ability to think, concentrate, complete anything."  (R. 263)  She indicated Evers is unable to follow written instructions well, having to read and re-read them, and ask questions repeatedly to be sure he is doing something correctly.  (*Id.*)  She stated that when Evers encounters stress, his "anxiety goes threw [sic] the roof."  (R. 264)  She observed that Evers fears dying in his sleep, thinks people are watching him all the time, and exhibits "nervous shaking of leg."  (*Id.*)

Junker indicated on June 14, 2005, that he spent a couple of hours a week visiting with Evers.  He described Evers's daily activities as watching television, and occasionally going to the library to read newspapers and magazines and check his email.  Junker also stated Evers has to be reminded to tend to his personal hygiene and put on clean clothes.  (R. 237-38)  He also stated a friend calls Evers to remind him to take his medications.  (R. 238)  Junker stated Evers does his own laundry, dishes, and mowing as needed, but these tasks take him quite awhile to complete, and Evers limits these activities because they cause pain in his arms.  (R. 238-39)  According to Junker, Evers has exhibited increasing difficulty sitting still and concentrating on what he is doing.  (R. 240)

The ALJ found these observations by Evers's friends "to be sincere, well-intentioned, and essentially consistent with [Evers's] asserted limitations," but the ALJ gave greater weight to the medical evidence of record, which he found supported his assessment of Evers's residual functional capacity.  (R. 29)  He noted that the lifting limitations in his RFC are consistent with Evers's testimony that he is able to lift twenty pounds.  (R. 30)

The ALJ found Evers's subjective statements regarding the intensity, persistence, and limiting effects of his impairments not to be fully credible.  He noted Evers "testified

that he quits a job when he gets bored, which strongly suggests that his frequent job losses are not due to any medically documented mental impairment but rather are due to his own life choices." (R. 32) He also observed that Evers "has performed work at the substantial gainful activity level during just three years, in 1992, 1994, and 1996," reflecting a less-than-significant motivation to return to work. (*Id.*) The ALJ noted Evers has not reported any adverse side effects from his medications, and his daily activities are "inconsistent with a finding of disability." (*Id.*)

The ALJ considered Evers's subjective complaints in arriving at his RFC. He limited Evers to simple, unskilled work at the light exertional level based on Evers's testimony regarding his daytime fatigue due to sleep apnea, and his medically-documented diabetes. He "further reduced the residual functional capacity to incorporate limitations relating to [Evers's] mental impairments." (R. 30) The ALJ did not adopt the opinions of the medical consultants, who limited Evers to work at the medium exertional level, instead reducing the RFC "to accommodate the effects of [Evers's] subjective complaints." (*Id.*) The ALJ gave great weight to the opinions of the ME, "who is familiar with disability program requirements and had the opportunity to review the medical evidence of record and hear the claimant's testimony." (*Id.*)

The ALJ concluded that Evers has the RFC to return to his past relevant work as an assembler, and he therefore is not disabled. (R. 32)

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C.

§ 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, *supra*, 2007 WL 2593631 at *2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering

simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon, supra.* The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical

history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page* 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health &*

*Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier*, 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823

F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the
> evidence presented relating to subjective complaints, including
> the claimant's prior work record, and observations by third
> parties and treating and examining physicians relating to such
> matters as:
>
> 1)      the claimant's daily activities;
> 2)      the duration, frequency and intensity of the pain;
> 3)      precipitating and aggravating factors;
> 4)      dosage, effectiveness and side effects of
>         medication;
> 5)      functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. DISCUSSION

Evers first argues the ALJ erred in analyzing his GAF scores. He argues the ALJ's findings are inaccurate factually, and the ALJ's analysis of GAF scores of 50 and under was flawed. The record shows that Evers's treating physicians estimated his GAF as follows[4]:

---

[4]The court notes that Evers's chronology of his GAF scores in his brief is incomplete.

| 07/03/01 | 72 | R. 286 |
| 01/31/02 | 72 | R. 283 |
| **04/01/02** | **Evers's alleged disability onset date** | |
| 06/25/02 | about 66 | R. 279 |
| 11/07/02 | 60 to 65 | R. 332 |
| 09/19/03 | 53 current; 62 past year's high | R. 325 |
| 12/30/04 | 45-50 current; past year unknown | R. 510 |
| 02/03/05 | 45 current; past year unknown | R. 508 |
| 05/20/05 | 50 with serious symptoms | R. 574 |
| 06/10/05 | 55 with moderate symptoms | R. 572 |
| 07/15/05 | 50 with serious symptoms | R. 571 |
| 08/16/05 | 50 with moderate symptoms | R. 569 |
| 09/13/05 | 50-55 with moderate to serious symptoms | R. 567 |
| 10/17/05 | 50 with moderate to serious symptoms | R. 566 |
| 02/03/06 | 50 with moderate to serious symptoms | R. 563 |
| 03/08/06 | 50 with moderate to serious symptoms | R. 562 |
| 04/05/06 | 50 with moderate to serious symptoms | R. 559 |
| 04/27/06 | 55 with moderate symptoms | R. 558 |
| 06/21/06 | 55 with moderate symptoms | R. 554 |
| 08/31/06 | 55 with moderate symptoms | R. 553 |
| 11/15/06 | 55 with moderate symptoms | R. 550 |
| 01/18/07 | 55 with moderate symptoms | R. 549 |
| 03/15/07 | 55 | R. 547 |
| 04/12/07 | 55 | R. 544 |
| 07/09/07 | 50 | R. 505 |
| 09/24/07 | 55; past year unspecified | R. 490 |
| 01/22/08 | 55 | R. 591 |

The ALJ indicated "the majority of [Evers's] GAF assessments have ranged between 50 to 55, indicating essentially moderate limitations in social functioning." (R. 27)  The ALJ correctly observed that the majority of the GAF scores are in the 50 to 55 range.  (*See* R. 27)  Further, the court notes Evers's GAF scores did not even begin to suggest he might be disabled until nearly eighteen months after his alleged disability onset date.

As can be seen from the doctors' notations, Evers was assessed as having serious symptoms on two occasions, moderate to serious symptoms on four occasions, moderate

symptoms on seven occasions, and GAF scores of 50 once and 55 four times with no further notation regarding the severity of his symptoms. "A GAF score of 55 indicates at least moderate symptoms or moderate difficulty in [psychological], occupational, or social functioning." *Vargas v. Lambert*, 159 F.3d 1161, 1164 (9th Cir. 1998) (citing *Diagnostic and Statistical Manual of Mental Disorders* 12 (3rd. ed., rev. 1987) ("DSM-IV")). A GAF score of 50 is at the high end of ratings indicating more serious symptoms. As one court has observed:

> The GAF scale is a 'hypothetical continuum of mental health-illness' used to determine 'psychological, social, and occupational functioning.' *See* DSM-IV, at 32. . . . The GAF scale goes from 0-90. The relevant scores for this case are 71-80 -- no more than slight impairment in social and occupational functioning, 61-70 -- mild symptoms or some difficulty with social and occupational functioning, 51-60 -- moderate symptoms or moderate difficulty with social and occupational functioning, 41-50 -- serious symptoms or serious impairment with social and occupational functioning, and 31-40 -- some impairment in reality testing or communication or major impairment in several areas such as work, family relations, and judgment.

*Bartrom v. Apfel*, 234 F.3d 1272 (Table), 2000 WL 1412777, at *1 n.3 (7th Cir. Sept. 20, 2000).

The ALJ found Evers's GAF scores "between June 2002 and September 2007 . . . indicat[ed] essentially moderate limitations in social functioning." (R. 27) Evers takes issue with this conclusion, arguing the chronology shows several occasions when his treating physicians noted "serious" or "moderate to serious" symptoms. He also argues a finding that a GAF of 50 reveals only "moderate" limitations is inconsistent with the case law, relying on *Pate-Fires v. Astrue*, 564 F.3d 935 (8th Cir. 2009), and *Edwards v. Barnhart*, 383 F. Supp. 2d 920 (E.D. Mich. 2005)). (Doc. No. 11, pp. 9-10)

The GAF is a diagnostic tool that "enables the clinician to comprehensively and systematically evaluate a client." *Stalvey v. Apfel*, 1999 W.L. 626133 (10th Cir. 1998) (citing DSM-IV at 25 (4th ed. 1994)). However, "[t]he GAF is not an absolute determiner of ability to work." *Id.* "[T]he Commissioner [of Social Security] has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' . . . [but] the GAF scores may still be used to assist the ALJ in assessing the level of a claimant's functioning." *Halverson v. Astrue*, ___ F.3d ___, 2010 WL 1253736 at *7 (8th Cir. Apr. 2, 2010) (quoting 65 Fed. Reg. 50746, 50764-65, 2000 WL 1173632 (Aug. 21, 2000); and citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002), for the proposition that "'[w]hile a GAF score may be of considerable help to the ALJ in formulating the [residual functional capacity,] it is not essential to the RFC's accuracy.'").

The *Halverson* decision rebuts Evers's reliance on *Pate-Fires* in support of his argument. The *Halverson* court noted that the claimant in *Pate-Fires* had a GAF score above 50 only four out of twenty-one times in a six-year period. The *Pate-Fires* court had "noted the history of the GAF scores at 50 or below, taken as a whole, demonstrated the claimant had serious symptoms or serious impairment in social, occupation, or school functioning." *Id.* (citing *Pate-Fires*, 564 F.3d at 944). The *Halverson* court applied the same principle "in the converse," noting that a "history of GAF scores between 52 and 60, taken as a whole, indicate [the claimant] has moderate symptoms or moderate difficulty in social or occupational functioning." *Id.* (citing DSM-IV at 34).

In the present case, the continuity of GAF scores in the 50 to 55 range supports the ALJ's conclusion that Evers experienced "essentially moderate limitations in social functioning" between June 2002 and September 2007. (R. 27) The physicians' treatment notes regarding Evers's ongoing condition often contain nothing to support the frequent change from "50 with moderate symptoms" to "50 with serious symptoms" or "50 with moderate to serious symptoms." For example, on June 10, 2005, Dr. Sparhawk's notes

indicate Evers was "showing some improvement on the current [medication] regimen," and his medications were continued without change. Dr. Sparhawk estimated Evers's GAF at "55 with moderate symptoms." (R. 440, 572) One month later, on July 15, 2005, Dr. Sparhawk noted Evers was showing "some significant improvement" on his current medications, but he inexplicably estimated Evers's GAF at "55 with serious symptoms." (R. 439,571) The court also finds it notable that the vast majority of Evers's GAF assessments were made during very brief visits with doctors for purposes of medication monitoring. The assessments were based largely on Evers's self-reports of his symptoms and progress, and were not made on the basis of any in-depth counseling sessions or objective testing. Given Evers's activities of daily living throughout the period in question in this case, the court finds no error in the ALJ's conclusion that, taken as a whole, Evers's GAF assessments indicated he experienced "essentially moderate limitations in social functioning."

Evers also argues the ALJ failed to give appropriate weight to the opinions of his treating physicians. However, his argument is based, again, on the GAF scores assigned by his treating physicians. There are indications in the record that at some points in time, Evers might have been unable to sustain gainful employment. On December 30, 2004, Dr. Koss noted, "In regards to disability, patient does have symptomotology [sic] at this time to include anxiety which might interfere with gainful employment. Patient relates in process of appeal of his disability determination." (R. 371, 510) He estimated Evers's GAF at that time to be 45 to 50. On February 3, 2005, he estimated Evers's GAF to be 45, and noted "in regards to disability to [Evers's] current symptomatology of severe depression, difficulty concentrating, feeling fatigued, feeling hopeless and helpless at times with increased stressors from finances, etc. I feel patient unable to do gainful employment at this time." (R. 383, 508) But by June 2005, Dr. Sparhawk estimated Evers's GAF to be 55 with moderate symptoms, and the record indicates Evers's medication regimen was

providing him with significant relief from his symptoms. Therefore, the record indicates Evers's inability to work did not last for a period of twelve months or longer.

"A treating physician's opinion is normally entitled to great weight." *Rankin v. Apfel*, 195 F.3d 427, 429 (8th Cir. 1999) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)). But where the physician's conclusion is based heavily on the claimant's subjective complaints and is at odds with the weight of the objective evidence, the physician's opinion properly may not be afforded the same degree of deference. *Id.* (citing *Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir. 1999)). The Eight Circuit Court of Appeals has " cautioned that such an opinion 'do[es] not automatically control, since the record must be evaluated as a whole.'" *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000) (quoting *Rankin v. Apfel*, 195 F.3d 427, 430 (8th Cir. 1999)). In the present case, the ALJ conducted a very thorough, thoughtful evaluation of the medical evidence, and the court finds the ALJ gave appropriate weight to the opinions of Evers's treating physicians.

Evers also argues the ALJ failed to examine the VE adequately. He argues, "The examination of the VE by the ALJ consisted of a few questions which neglected to include many significant details that were in evidence." (Doc. No. 11, p. 12) Evers notes the ALJ failed to ask the VE about the impact of his GAF scores, his frequent anxiety attacks and fatigue, his poor hygiene, and his "lack of concentration, including his inability to focus and remain on tasks due to his ADHD." (*Id.*)

The Eighth Circuit Court of Appeals has held an ALJ's hypothetical question must fully describe the claimant's abilities and impairments as evidenced in the record *See Chamberlain v. Shalala*, 47 F.3d 1489, 1495 (8th Cir. 1995) (citing *Shelltrack v. Sullivan*, 938 F.2d 894, 898 (8th Cir. 1991)). "The point of the hypothetical question is to clearly present to the VE a set of limitations that mirror those of the claimant." *Roe v. Chater*, 92 F.3d 672, 676 (8th Cir. 1996) (citing *Hogg v. Shalala*, 45 F.3d 276, 279 (8th Cir. 1995)); *accord Hutton v. Apfel*, 175 F.3d 651, 656 (9th Cir. 1999) (A "proper hypothetical

question presents to the vocational expert a set of limitations that mirror those of the claimant."); *see Wiekamp v. Apfel*, 116 F. Supp. 2d. 1056, 1073-74 (N.D. Iowa 2000) (Bennett, J.). A hypothetical question is "sufficient if it sets forth the impairments which are accepted as true by the ALJ." *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997); *House v. Shalala*, 34 F.3d 691, 694 (8th Cir. 1994). Only the impairments substantially supported by the record as a whole must be included in the ALJ's hypothetical. *Cruze v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996) (citing *Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993)).

If a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence to support the ALJ's finding of no disability. *Cruze*, 85 F.3d at 1323 (citing *Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994)). The ALJ may produce evidence of suitable jobs by eliciting testimony from a VE "concerning availability of jobs which a person with the claimant's particular residual functional capacity can perform." *Cox v. Apfel*, 160 F.3d 1203, 1207 (8th Cir. 1998).

In this case, the ALJ's questioning of the VE was markedly limited. The entire colloquy between the ALJ and the VE was as follows:

Q      Is there any past relevant work?

A      Yes, there is.

Q      Have you prepared an exhibit for this?

A      No, actually it's in the first file, it's on 11E, there's a vocational exhibit which has not changed since that time.

Q      Oh, okay.

A      It's included in those pages that are kind of folded together there at the very beginning.

Q      Okay. So if he were limited to work that should not be any more exertional than light but would be simple and unskilled and superficial contact at best with the public and fellow

| Q | employees, minimum stress, could he return to any of this past relevant work? |
|---|---|
| A | Possibly the assembly jobs. He performed a number of different assembler positions over the year. |
| Q | And the permitted absenteeism from that? |
| A | One day a month. |
| Q | Okay. |

(R. 615-16)

The ALJ did not set forth any of Evers's limitations; rather, he asked a brief question that restated his assessment of Evers's residual functional capacity. However, the Commissioner correctly notes that the ALJ was not required to obtain any vocational testimony at all in this case. Although "'[i]t is the ALJ's duty to develop the record fully and fairly, even in cases in which the claimant is represented by counsel,'" *Bishop v. Sullivan*, 900 F.2d 1259, 1262 (8th Cir. 1990) (quoting *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985)); *accord Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); "[t]he testimony of a VE is required only when the claimant carries his initial burden of showing that he is incapable of performing past relevant work and the claimant has a nonexertional injury." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Johnston v. Shalala*, 42 F.3d 448, 452 (8th Cir. 1994)). In the present case, Evers failed to carry this burden. The record contains substantial evidence that Evers's impairments are not as limiting as he claims. He testified he reads two or three books per week. He goes to the library regularly to check email. He plays computer games until the wee hours of the morning. He entertains friends, and even goes to a club to engage in karaoke. These are not the actions of a person who is completely disabled and unable to perform any type of work.

Finally, Evers argues the ALJ erred in discounting his credibility. Evers's testimony that he has problems reading, checking his email, and even using the computer was inconsistent with his self-report to his state agency evaluator, and with his friends'

observations. In September 2003, he told psychologist Herrick that "he can read 2 to 3 books a week and is likely to spend long hours on his computer. At times he will not shut it off until 2 to 4 a.m. and then go to bed. Most of his computer time is spend [sic] playing games." (R. 322) Evers testified he goes to the library to check email about twice a week. (R. 611) Evers's friend, Junker, also reported that Evers goes to the library to read and check his email. He also noted Evers completes his own household tasks, including mowing, although these tasks may take him awhile to complete. (R. 238-39) Although his limitations would limit the numbers and types of jobs he could perform, the record demonstrates that Evers would be able to maintain gainful employment at the level found by the ALJ.

There is no doubt that Evers has some severe impairments, a fact considered by the ALJ. However, the record does not contain substantial evidence that his impairments would prevent him from performing all types of work. Individual psychotherapy was recommended for Evers early on (R. 280), and could have assisted him in addressing his difficulty staying committed to his jobs, but Evers declined the recommendation and did not begin individual therapy until January 2008. "'A failure to follow a recommended course of treatment also weighs against a claimant's credibility.'" *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) (quoting *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005)).

Considering the totality of the record as a whole, the court finds substantial evidence supports the ALJ's decision that, at least through the date of the ALJ's decision, Evers was not disabled.

## IV. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[5] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within fourteen (14) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be affirmed.

**IT IS SO ORDERED.**

**DATED** this 20th day of April, 2010.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[5]Objections must specify the parts of the report and recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72.