**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

BRAD EVERS,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C 09-4018-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
MAGISTRATE JUDGE'S REPORT
AND RECOMMENDATION**

———————————

**TABLE OF CONTENTS**

*I.* **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A.* **Procedural Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B.* **Factual Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      *1.* **Introductory facts and Evers's hearing testimony** . . . . . . . . . 4
      *2.* **Relevant medical history** . . . . . . . . . . . . . . . . . . . . . . . . 6
      *3.* **Medical expert's testimony** . . . . . . . . . . . . . . . . . . . . . . 26
      *4.* **Vocational expert's testimony** . . . . . . . . . . . . . . . . . . . . 27
      *5.* **The ALJ's decision** . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*II.* **LEGAL STANDARDS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*III.* **LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
   *A.* **GAF Assessments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
   *B.* **Physician Opinions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
   *C.* **Credibility Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
   *D.* **ALJ's Questions to the Vocational Expert** . . . . . . . . . . . . . . . 50

*IV.* **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

# I.  INTRODUCTION

## A.  Procedural Background

On May 16, 2005, Plaintiff Brad Evers filed his applications for disability insurance benefits under Title II[1] of the Social Security Act, 42 U.S.C. §401 *et seq.*, and for Supplemental Security Income payments under Title XVI[2] of the Act, 42 U.S.C. §1381 *et seq.*, alleging a disability onset date of April 1, 2002.  Evers claims that he is disabled due to his depression and anxiety, which affects his ability to concentrate and his desire to look for and maintain employment.  The Defendant Commissioner of Social Security ("Commissioner") denied Evers's applications and affirmed the denial on reconsideration.  Evers timely requested a hearing before an Administrative Law Judge ("ALJ").  On January 25, 2008, the ALJ found that Evers was not disabled because he was capable of returning to his past relevant work as an assembler.  Evers appealed the ALJ's ruling.  On February 9, 2009, the Appeals Council denied his request for review, and this denial constituted a final decision of the Commissioner.

On March 20, 2009, Evers filed a complaint in this court seeking review of the Commissioner's decision (docket no. 3). The case was referred to Chief United States Magistrate Judge Paul A. Zoss for a report and recommendation, in accordance with Administrative Order #1447.

Evers filed a brief in support of his claim on July 22, 2009 (docket no. 11).  In his brief, Evers claimed that the ALJ erred by: 1) improperly analyzing his Global Assessment of Functioning ("GAF") scores; 2) failing to give appropriate weight to the opinion of his

---

[1] Title II of the Social Security Act provides insurance benefits to individuals who establish that they suffer from a physical or mental disability.  *See* 42 U.S.C. § 423.

[2] Title XVI of the Social Security Act provides supplemental income to individuals who are disabled while also indigent.  *See* 42 U.S.C. § 1382.

treating doctors; 3) failing to adequately examine the vocational expert; and 4) erroneously discounting his credibility. For these reasons, Evers argued that the court should reverse the Commissioner's decision and award disability benefits to him. In the alternative, he requested that the court remand the case to the Commissioner for further proceedings.

The Commissioner filed his brief on October 19, 2009 (docket no. 14). The Commissioner argued that substantial evidence supports the ALJ's finding that Evers's impairments would not preclude him from performing his past relevant work, and consequently, that Evers was not disabled. Therefore, the Commissioner requested that his decision be affirmed.

On April 20, 2010, Judge Zoss issued his Report and Recommendation (docket no. 16). He found that substantial evidence supports the ALJ's decision that Evers is not disabled. In particular, Judge Zoss found no error in the ALJ's conclusion that Evers's GAF assessments indicated, "essentially moderate limitations in social functioning." *Id.* Next, Judge Zoss found that the ALJ conducted a thorough evaluation of the medical evidence and gave appropriate weight to the opinions of Evers's treating physicians. Moreover, Judge Zoss found that the ALJ did not err in failing to examine the vocational expert because, in this case, Evers failed to carry his initial burden of showing that he is incapable of performing past relevant work and he has a nonexertional injury. Finally, Judge Zoss found that the ALJ did not err in discounting Evers's credibility because the records contained substantial evidence that is inconsistent with his testimony about his impairments. Therefore, Judge Zoss recommended that the court affirm the Commissioner's decision.

On April 29, 2010, Evers filed his Objection to Judge Zoss's Report and Recommendation (docket no. 17). In his Objection, Evers objects to Judge Zoss's conclusion that the Commissioner's finding that he was not disabled should be affirmed.

Evers elaborates on the same combination of errors he identified in his initial brief. Evers requests that the court overrule the Report and Recommendation, reverse the Commissioner's decision, and award disability benefits to him under the Social Security Act. In the alternative, he requests that the court remand his claim to the Social Security Administration for further proceedings.

The Commissioner filed his Response to Plaintiff's Objection to the United States Magistrate Judge's Report and Recommendation on May 5, 2010 (docket no. 18). In his Response, the Commissioner reiterates his position on the issues regarding the GAF assessments and Evers's credibility. The Commissioner addresses the remainder of Evers's objections by incorporating the arguments he made in his initial brief. The Commissioner urges the court to adopt Judge Zoss's Report and Recommendation.

## B. Factual Background

In Judge Zoss's Report and Recommendation, he made the following findings of fact:

### 1. Introductory facts and Evers's hearing testimony

Evers was forty-two years old at the time of the hearing. He lived in Mountain Lake, Minnesota, with his wife. He drove a van with an automatic transmission from his home to the hearing location. He has a restriction on his license requiring him to wear glasses. (R. 597-600) He generally drives less than 100 miles in a typical week. (R. 601) He spends most of his time at home because he does not like to be out in public. (R. 600) He attends church but no other regularly-scheduled events or functions. He watches three or four hours of television a day, reads for about an hour, and visits friends about once a week. (R. 601-02) About twice a week, he goes to the library and uses the computer to check his email. (R. 611) He occasionally goes

to a local club to do karaoke. (*Id.*)  He smokes about a pack of cigarettes a day, and does not drink alcohol.  (R. 603)

Evers did poorly in school and was in special education classes.  He repeated one grade.  (R. 607)  He stated the problems leading to his disability claim include "[d]epression, anxiety, ADHD, [and] concentration problems."  (R. 598) His doctors have prescribed medications for him that help "[t]o a degree," making it easier for him to live with his symptoms. (R. 599)  He has sleep apnea that causes him to have difficulty falling asleep, and then staying asleep for more than two to three hours at a time.  He awakens numerous times during the night with apnea episodes.  (R. 599-600, 609)

By the time of the ALJ hearing, Evers was not helping out around the house.[3]  He stated he has "bad shoulders and due to [his] diabetes . . . two bad elbows."  (R. 600)  He has had "[n]erve impingement surgeries," causing his arms to hurt all the time, and his hands to hurt and be numb.  (R. 600-01) As a result, he is unable to lift without pain.  (R. 601) Doctors gave him some exercises to do for his shoulders, but Evers stated they did not help him.  (R. 603)

Evers estimated he last worked in 2000 or 2001.  The ALJ noted Evers had had a lot of different types of jobs, and Evers stated there was no particular reason for this.  (R. 603-04)  From 1995 to early 2001, Evers worked as a cashier at a gas station, and a machine operator, frame bender, and assembler at a factory.  (R. 141)  He indicated the longest he ever held a job was about a year, when he worked as a frame bender at a factory from October 1996 to November 1997.  He once held a job for only one month.  He stated he will get bored with a job and quit, or he might be criticized by a supervisor and "just walk off."  (R. 141, 607-08)  He stated he "can't take" criticism.  (R. 608)

---

[3] Records from a psychological exam in September 2003 indicate Evers previously took an active role in household duties and child care.  (*See* R. 323)

Evers has anxiety attacks several times a day, with each attack lasting five to ten minutes. When he has an anxiety attack, he suffers chest pains, sweats, and sometimes has headaches. He cannot identify any particular trigger for the attacks, and he even has anxiety attacks when he is at home. He also has frequent mood swings, and being out in public around a lot of people makes him nervous. He has low self-esteem, has problems with fatigue and lack of energy, and feels "really down" frequently during the day. He has problems with concentration and is easily distracted, and he stated his wife has to remind him to take care of his personal hygiene. (R. 608-09) He has had thoughts of suicide at times, but has never had a plan, and doctors have increased his antidepressant dosages to address these thoughts. (R. 605-06) He has difficulties with both short-term and long-term memory. (R. 606) He gets along with people reasonably well, but he is bothered by crowds and noise. He also has problems with humidity. He has some hearing difficulties and wears hearing aids in both ears. (*Id.*)

Evers estimated he could walk for about ten minutes and stand for ten to fifteen minutes before having to stop and rest. He can bend at the waist. He has had knee surgery that affects his ability to stoop and squat. He can use his hands and fingers, but he has numbness in them and drops things frequently. He can dress himself. He estimated he can lift about twenty pounds without difficulty. He can remain seated for a couple of hours before having to get up. (R. 604-05)

## 2.     *Relevant medical history*

Evers's relevant medical history of record begins in July 2001, when he was seen for psychiatric medication management. At that time, he was being treated with Serzone for depression, Adderall for ADHD, and Xanax for anxiety. His condition was noted to be stable, with no evidence of psychosis or mania, no suicidal thoughts, and no acute stressors. He had a GAF of 72, and "no exacerbated

symptoms of anxiety, depression, etc." (R. 286) On January 31, 2002, Evers continued to report no significant symptoms of anxiety or depression. He was eating and sleeping well. His GAF continued to be 72. (R. 282-83) He asked to discontinue taking Serzone, and requested that he not be started on any other antidepressant. Notes indicate Evers had never had "any symptoms severe enough to lead to inpatient psychiatric hospitalization for anxiety or depression." (R. 283) He was cautioned that as he decreased his Serzone dosage, he could have a recurrence of symptoms, and he was instructed to call if he had any significant worsening of depression or suicidal thoughts. The doctor opined that Evers might be "physiologically dependent on Xanax," although he did not have any of the typical symptoms and he was not abusing Xanax. (*Id.*)

On June 25, 2002, Evers reported that he had been feeling depressed again for six weeks, "[e]vidently . . . precipitated by his divorce proceeding that ha[d] been initiated a few months ago." (R. 279) His GAF was assessed at 66. He asked to get back on an antidepressant, and he was prescribed a trial of Zoloft. The doctor noted, "I did offer [Evers] individual psychotherapy, which I feel is important . . . in this case because of his ongoing stresses, but he has refused that." (R. 280)

On September 12, 2002, Evers was evaluated by Jerome J. Perra, M.D. for complaints of left hand numbness and left elbow pain. The doctor diagnosed him with ulnar neuritis and possible wrist entrapment. "He was fitted with a large elbow pad and was advised to avoid resting his elbow on tables or arm rests." (R. 406) Anti-inflammatories were recommended, and the doctor ordered nerve conduction studies. (R. 406-07) Evers returned to see the doctor on September 19, 2002, complaining of increasing pain in his left forearm and hand. The doctor recommended "a short course of oral steroids to try to decrease the local irritation and inflammation." (R. 405) Notes indicate that Evers was not currently working, "but if he were, he would be at restriction

of no gripping or grasping or repetitive pushing or pulling activities." (*Id.*)

On September 23, 2002, Evers underwent a peripheral nerve conduction study of his left upper extremity in connection with his complaints of left hand numbness and pain. The study "was normal with the exception of mildly delayed sensory latencies across the wrists segment of the left median nerve," which findings were noted to be "compatible with a mild left median nerve entrapment at the wrist (mild left carpal tunnel syndrome)." (R. 415; emphasis in original) Evers saw Dr. Perra for follow-up on October 3, 2002. The doctor recommended an EMG of his left upper extremity, and he restricted Evers to no repetitive fine detail or repetitive gripping or grasping, and no manual labor with his left hand. He noted Evers could "still do right handed activities and use his left hand for assistance." (R. 404)

On October 28, 2002, Evers underwent an EMG/Nerve Conduction Study which resulted in findings of "[p]robable mild left ulnar neuropathy with decrease in amplitude across the elbow and mild denervation of the FDI," and "[m]inimal left median neuropathy with slowing across the wrist consistent with carpal tunnel syndrome." (R. 411)

On October 31, 2002, Evers returned to see Dr. Perra for follow-up of "left arm pain and tingling to the small, ring, and long fingers." (R. 402) Evers stated his symptoms were worsening, and he was experiencing burning pain in his arm and elbow, as well as pain and intermittent numbness of his fingers. The doctor recommended a trial of "a neuroleptic agent such as Neurontin for a period of 4 to 6 weeks before considering any other interventions." (*Id.*) Notes indicate Evers "asked about work restrictions," and the doctor indicated Evers would be unable "to maintain a job with heavy gripping activities or prolonged grasping because of his symptoms. [He gave Evers] a list of some restrictions, but . . . he could do a job that involves occasional reaching and grasping. Clerical jobs, check-out type jobs should be considered." (*Id.*)

Later the same day, Dr. Perra noted the following in Evers's medical records:

> I received a call from Kendra Moose who is Brad Evers'[s] job counselor. She asked for some clarification of his job restrictions so she can help him seek employment. We discussed the above limitations. The patient brought back another copy of his work restrictions requesting that he be kept completely off work because he is having a hard time finding work with these restrictions. I do not believe total restriction from work is appropriate at this time.

(R. 403)

On November 7, 2002, Evers was seen at Southwestern Mental Health Center in Windom, Minnesota, for an intake evaluation. He indicated he had been driving to New Ulm, Minnesota, for treatment, and he was looking for a doctor closer to his home to treat him for anxiety, ADD, and depression. Notes indicate that when Evers was "asked specifically what [was] wrong with him, he state[d] he gets frustrated easily, can't keep his concentration, therefore, he can't hold a job. He's been unemployed for two years [and has] never been employed for more than one year at anyone [sic] time. . . ." (R. 331) Lyle P. Christopherson, D.O., the psychiatrist who interviewed Evers, noted the following from his mental status exam:

> This 37 year old, obese white male is somewhat anxious and shy with medium eye contact. He was somewhat restricted when the interview first begins, but he does loosen up as the interview progresses. He tends to have a lot of denials and tends to project[], various aches and pains and a variety of circumstances including his ex-wife. He is angry at the surgeon for not supporting him in what he feels is a disability. He demonstrated no evidence of active hallucinations, does claim to be somewhat depressed and does state that the Zoloft works better than the Serzone. He does complain of

9

sexual dysfunction. When asked about sleep, he states he sleeps fine but his girlfriend states she hears him gasping for air. He apparently has a brother with sleep apnea and he may have it also. He has always been big structured, but states he was really heavy a year and a half ago. He states he has lost 80 pounds in dieting secondary to diagnosis of Diabetes. He does enjoy some things in life. He worries about appropriate things, no money, lots of bills, his future. He does have a form he wants filled out for disability. His energy level was impaired, concentration has always been impaired. He was always in Special Education classes. Mild psychomotor retardation. He did have suicidal thoughts back during his divorce. Denies them at this time. No evidence of psychotic thought processes. No evidence of hallucinations or delusions.

(R. 332) Dr. Christopherson diagnosed Evers with Depression, NOS; Generalized Anxiety Disorder; Previous Diagnosis of ADD; Rule out Mood and Anxiety Disorder secondary to sleep apnea; Dependent Personality Traits, Avoidant Features; Questionable Sleep Apnea; orthopedic problems with his shoulders; Impingement of the Ulnar Nerve on the left side; Obesity; and Moderate Psychosocial Stressors; with a current GAF of 60 to 65. (*Id.*) He switched Evers to Adderall XR. (*Id.*)

On November 20, 2002, Evers saw his family doctor to request a sleep apnea study. He complained that he would awaken at night gasping for air. He had smoked one to two packs of cigarettes a day for many years, but reported that he had quit smoking a couple of months earlier. He was referred for a sleep apnea study. (R. 294) Notes also indicate that Evers was treated regularly for Type II diabetes. He was doing well on Glucotrol and lost over 80 pounds between April and September 2002. He was advised that he likely could handle his diabetes without medication if he could lose more weight. (R. 296; *see* R. 295-97)

Evers saw Dr. Perra on December 19, 2002, for follow-up of his forearm pain and finger tingling. He stated the Neurontin had not helped him, and the pain in his arm and tingling in his fingers continued, causing him problems with "many daily activities." (R. 401) The doctor recommended Evers be evaluated by a specialist in hand surgery. (*Id.*)

Evers returned to see Dr. Christopherson on January 2, 2003. He reported "getting along fairly well," with "[]no evidence of psychotic thought processes, . . . hallucinations or delusions." (R. 330) His Adderall dosage was increased and he was directed to return in three months. (*Id.*) He saw Dr. Christopherson again on April 3, 2003, reporting that the Adderall did not seem to be working. Dr. Christopherson questioned the diagnosis of ADD, noting Evers suffers from what "seems more of a personality disorder, Cluster A avoidant type and depressed." (R. 329) Evers denied any psychotic symptoms. Buspar was added to Evers's medications, and he was switched from Adderall XR to "regular Adderall." (*Id.*)

Evers was evaluated by Lawrence T. Donovan, D.O. on January 15, 2003, in connection with his arm and hand problems. He was diagnosed with left cubital tunnel syndrome[4], status post median nerve decompression. (R. 399-400) He was scheduled for surgery, and on January 31, 2003, he underwent a surgical procedure for cubital tunnel syndrome. (R. 384-85) One week after the surgery, Evers reported that his finger numbness had resolved, and he complained of only mild elbow discomfort. He was placed in a sling, and was advised to perform range-of-motion exercises and avoid any heavy pulling. (R. 398) At his next follow-up exam, on February 26, 2003, Evers reported doing quite well, with no further complaints of numbness and no apparent

---

[4] "Cubital tunnel syndrome is the effect of pressure on the ulnar nerve, one of the main nerves of the hand. It can result in a variety of problems, including pain, swelling, weakness, or clumsiness of the hand and tingling or numbness of the ring and small fingers. It also often results in elbow pain on the side of the arm next to the chest." http://www.eatonhand.com/hw/hw007.htm (Mar. 26, 2010).

distress. He was advised to increase his activities as tolerated, and follow up as needed. (R. 397)

On April 8, 2003, Evers underwent a peripheral nerve conduction study of his right upper extremity. The study "revealed abnormal findings compatible with a <u>mild</u> right median nerve entrapment at the wrist (<u>mild</u> right carpal tunnel syndrome)." (R. 408; emphasis in original)

Evers saw Dr. Donovan on April 23, 2003, for evaluation of his complaints of right elbow and forearm pain. (R. 395-96) Evers related "a long history of tennis elbow," which began seven or eight years earlier. Following his examination, the doctor recommended "a course of physical therapy for iontophoresis and stretching exercises" to address Evers's tennis elbow. (R. 396) He ordered a nerve conduction study to evaluate the numbness in Evers's hand. (*Id.*)

Evers returned to see Dr. Donovan on May 7, 2003, with continued complaints of elbow and forearm pain on the right. Physical therapy had failed to improve his symptoms. The doctor diagnosed Evers with right tennis elbow, probable entrapment of the right radial nerve, and mild carpal tunnel syndrome by electrophysiologic criteria. He discussed options with Evers, who elected to go forward with surgery. (R. 393-94)

On May 20, 2003, Evers underwent "Right tennis elbow release" and "Decompression of radial nerve (posterior interosseous nerve, radial tunnel)" (R. 386-88) to address his "long history of tennis elbow." (R. 395) He had mild pain the day following surgery (R. 392), and on June 11, 2003, he reported his pain was "completely resolved," although he had "some stiffness of his elbow with extension." (R. 391) By July 23, 2003, Evers developed some increasing discomfort in his right elbow and forearm, with an "occasional clicking sensation in the elbow" with movement. (R. 390) Dr. Donovan prescribed physical therapy for two weeks. (*Id.*) On August 6, 2003, Evers reported that he was doing better with physical therapy, and he was "able to get his elbow out

completely straight." (R. 389) He continued to have occasional discomfort in his forearm. He was advised "to do activity as tolerated." (*Id.*)

Evers saw Dr. Christopherson again on June 19, 2003, and reported "doing fairly well." (R. 328) His Buspar dosage was increased, and Evers had weaned himself off of Xanax at the doctor's suggestion. (*Id.*)

On September 19, 2003, Evers was seen by E. Lynn Herrick, a Licensed Psychologist, for a mental status evaluation and activities of daily living assessment at the request of the state agency. (R. 321-25) Evers drove himself to the appointment. Evers stated he was diagnosed with an anxiety disorder as a child. He lived in a group home for treatment for three months. He took special education classes, and as a teenager, he dropped out of school three times. He eventually obtained a GED, and was able to graduate with his class in 1984. He then went to a vocational-technical training school to learn radio broadcasting, but he "became involved with drinking too much and eventually withdrew and returned home." (R. 321) Over the next few years, he changed jobs frequently, and he began using marijuana. He was taking medications for anxiety, but in 1990, he was convicted of selling his prescriptions and served 90 days in jail. (*Id.*)

He was married in 1995, and fathered three children in that marriage. He was injured on the job at a window factory, but he stayed on that job for over a year due to the pending workmen's compensation litigation. He stated this was the longest he had ever held a job. He and his wife separated in 2002, and when his divorce was final in 2003, he remarried and fathered another child. (R. 321-22)

Evers described his primary problem as an "inability to concentrate." (R. 322) He is "forgetful," and "has to be reminded to change clothes and take showers by his wife."

(*Id.*) Regarding his daily activities, Evers reported the following:

**Interests:** He reports that his interests include reading, watching TV and being on the computer. According to him, he can read 2 to 3 books a week and is likely to spend long hours on his computer. At times he will not shut it off until 2 to 4 a.m. and then go to bed. Most of his computer time is spend [sic] playing games.

**Activities:** His typical day usually starts around 9/9:30 a.m. when he gets up. He will eat breakfast, take his pills and then either watch TV or get on the computer. He does respond to his wife and new child, but most of his attention is placed on his interests. He reports that he does not "remember" to do his personal hygiene tasks and has to be reminded by his wife. He eats lunch around noon and continues whatever he started in the morning. There may be some friends who are likely to drop by and visit. After having supper around 6, the family either settles in for the evening or watches TV or they may go out and visit family or friends. His wife retires early and then he goes back to his computer and stays engaged until the wee hours of the morning when he falls to sleep.

He states both his wife and he share domestic duties including cleaning, meals, laundry and caring for their child. Until his child was born, his wife was on bed rest and he did all of the activities. He reports no restriction on his ability to leave the home and he participates in the shopping. When asked about the pace of his work, he reports that the primary problem is in getting himself started. He procrastinates a great deal. He did not see any problems with his ability to function with the daily tasks of the home. There were no symptoms reported that indicated depression other than his inability to get started. Concentration seems fine with both his reading and his computer games.

**Living Situation:** He lives with his wife and children and talks about having visitors throughout the day. There was no indication that any type of restrictive environment is needed.

**Ability to Relate:** He was quite open about never having any problems with relating to his co-workers or supervisors. It was his report that he has friends that stop by and he relates well to [them]. Their involvement in his life does not seem to create any problems. He has gone through a divorce over the last 18 months, which was somewhat disputed, but was able to find another partner that resulted in a marriage shortly after the divorce became final.

**Substance Abuse:** There was an admission that in his mid-twenties he had a problem with alcohol and marijuana. . . . He denies any current use of either alcohol or drugs other than his prescriptions, which he reports using appropriately.

(R. 322-23)

Regarding Evers's mental status, Herrick noted there was no evidence of any thought disorder, and Evers demonstrated an appropriate stream of consciousness during the interview. His memory appeared to be intact, and he did not describe any vegetative signs of depression. Although Evers reported difficulty with concentration, Herrick noted that he "admitted to reading two to three books a week and staying focused on his computer games for hours at a time." (R. 323-24) Evers reported having anxiety attacks, but stated they had not occurred for three or four months. (R. 324)

Herrick noted that Evers's "current psychiatrist has diagnosed him with a Cluster C personality disorder, specifically Mixed with dependent and avoidant," and Herrick found that "[t]he information presented suggests that he does possess these signs." (*Id.*)

Herrick made the following assessment of Evers's mental status:

> **Summary and diagnostic impression:** His presentation seemed to be genuine without any attempt to project an image and gives strong confidence that the assessment was accurate. His claim to have problems with concentration was not demonstrated during the mental status examination. He had no problems with his serial 7's. It appeared to be his admission that most of his difficulties with employment were related to loss of interest as opposed to mental health problems. He has presented a long history of psychiatric intervention involving medication monitoring dating back to late childhood. His current psychiatrist is less confident of the Attention Deficit Hyperactivity Disorder diagnosis and is more leaning to anxiety with a mixed personality disorder.
>
> His anxiety problems are connected to the history of agoraphobia. He did not endorse any daily problems with anxiety. His Buspar is prescribed to handle the anxiety and appears to be working.
>
> The personality disorder is determined through his report of the following symptoms: difficulty making decisions; difficulty expressing disagreement with others; difficulty in initiating projects; feeling uncomfortable at being alone; urgently seeks another relationship after the close of another one; avoids occupational activities that involve significant interpersonal interaction; inhibited in new interpersonal situations; views self as socially inept; and reluctant to take personal risks to try new activities.

(R. 324-25) Herrick diagnosed Evers with Anxiety Disorder NOS (by history), Depressive Disorder NOS, and Personality Disorder Mixed, with a current GAF of 53, and highest GAF in the preceding year of 62. She noted current stressors to be

"Occupational, unable to hold a job; [and] Economical, limited income." (R. 325) She further noted Evers should be able to handle his own funds. (*Id.*)

Herrick reached the following conclusion regarding Evers's work-related mental abilities:

> His mental capacity seems to be good. He was able to follow instructions well throughout the interview and he did not feel that it was difficult for him to assimilate to a new work environment. He should be able [to] retain and follow instructions. He also did not indicate that there had been any problem with his work rate. His difficulty is in the area of sustaining interest and motivation at work. It was also apparent from his responses that he was able to relate well to both co-workers and supervisors on the worksite. He gave no indication that stress from work interfered with his working ability.

(*Id.*)

On September 25, 2003, Evers returned to see Dr. Christopherson for a medication check. Evers reported that the Buspar had done nothing for him, and he requested to return to Xanax. He was excited about the birth of his new daughter. The doctor discontinued the Buspar and Evers agreed to a trial of Klonopin, which the doctor noted has "less abuse potential" than Xanax. (R. 327, 374)

On October 6, 2003, Russell Ludeke, Ph.D. reviewed the record and completed a Psychiatric Review Technique form (R. 351-64), and a Mental Residual Functional Capacity Assessment form (R. 365-68). He evaluated Evers under Listings 12.04, Affective Disorders, noting Evers has complained of sleep disturbance and difficulty concentrating or thinking; 12.06, Anxiety-Related Disorders; and 12.08, Personality Disorders. He opined Evers would have a mild degree of limitation in restriction of the activities of daily living; moderate degree of limitation in difficulties maintaining social functioning, and difficulties maintaining concentration,

persistence, or pace; and no episodes of decompensation. (R. 351-64) With regard to Evers's job-related mental limitations, Dr. Ludeke opined Evers would be moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and respond appropriately to changes in the work setting. He opined Evers would have no other significant limitations. (R. 65-66) He indicated Evers "[c]an understand and retain simple 1- and 4-step tasks. Pace and persistence are adequate for that. [H]e [c]an get along with peers and supervisors and briefly with the public. [H]e [c]an adapt to occasional, mild changes." (R. 367)

Evers saw Dr. Christopherson for medication monitoring on March 18, 2004. The doctor noted the following from his mental status examination:

[Evers] informs me that he has had 50 jobs in his lifetime and within a month he gets bored and quits or just can't concentrate and can't focus. Then he loses his job or quits the job. Therefore, he feels he is disabled. He is in the process of filing for disability and has attorneys fighting the case. He tells me that he could not go back to work or he wouldn't get disability which is probably somewhat true. He does have odd blinking and facial gesturing. I think he could at least try to have supervised structured work. Part of the reason he doesn't stay on the job is feeling that the work is under him or is beneath him. He does have some low self-esteem. The biggest problem this fellow has is a significant personality disorder. I don't see any disabling disability. He certainly should be able to find some sort of assistance. He stated the longest time he held a job was a manufacturing job. The only reason he stayed there is because he had a disability claim, he

got a repetitive injury to his elbow, but he was only there for a total of three months and did get some type of settlement from this company. I suspect there is a concern here that somebody as malicious as him it benefits society to keep him off the work force. However, he has excessive idle time and low self-esteem and would certainly benefit from getting a job including social contacts, using his time for something productive and the obvious benefits of monetary reasons. He gives an example of why he is stressed out and the example just exemplifies what happens when a fellow has way too much free time. Apparently it had something to do with him being at a gathering and something to do with a chair, he brought a chair back to his family and it was broke[n] and apparently this person cursed at him, then somebody threatened him and now he has been excessively worrying that people are following him. I pointed out to him that these are problems people get into when they have a lot of excessive free time and don't keep themselves busy. I'm not saying that it couldn't have happened if he was working. I truly don't see any reason he can't find work and stay with it. He complains bitterly of having a lot of anxiety but he is only taking 50 mgs. of Zoloft. Will increase that to 100 mgs.

(R. 373)

At Evers's next appointment, on July 29, 2004, Dr. Christopherson noted he was "somewhat aloof and less animated than he was on his last visit," and he opined Evers was "obviously still somewhat upset with this physician pertaining to my lack of support of his disability." (R. 372) The doctor noted, "As I had told him, he is disabled because he wants to be disabled and I don't really understand why society or Social Security would need to endorse giving him Social Security Disability." (*Id.*) Dr. Christopherson noted he was leaving the clinic, and perhaps Evers could "convince the

incoming psychiatrist that there is indeed some form of disability." (*Id.*)

On December 30, 2004, Evers saw Francis Koss, M.D. for medication management and diagnostic evaluation. (R. 370-71, 509-10) The doctor continued Evers on Zoloft for depression, Klonopin for anxiety, and Adderall for ADHD. Dr. Koss noted, "In regards to disability, patient does have symptomotology [sic] at this time to include anxiety which might interfere with gainful employment. Patient relates in process of appeal of his disability determination." (R. 371, 510) Dr. Koss assessed Evers's current GAF at 45-50. (*Id.*)

Evers returned to see Dr. Koss on February 3, 2005. He reported some increased stress from his pending disability action. His car had been repossessed. He reported feeling "more depressed, has sleep disturbance, increased anxiety, feels anger at times at the system, some decreased motivation, decrease[d] concentration, feels hopeless, helpless at times." (R. 383; 508) He also reported some recent auditory hallucinations. The doctor increased Evers's Zoloft dosage. He assessed Evers's current GAF at 45, and noted that "in regards to disability to [Evers's] current symptomatology of severe depression, difficulty concentrating, feeling fatigued, feeling hopeless and helpless at times with increased stressors from finances, etc. I feel patient unable to do gainful employment at this time." (*Id.*) Evers missed his next appointment for medication management scheduled for April 4, 2005. (R. 507)

Evers underwent a sleep study on April 5, 2005. The study revealed "[s]evere obstructive sleep apnea with desaturation during REM sleep, correct with CPAP 8 cm during sleep." (R. 418)

On May 20, 2005, Evers was seen for an intake evaluation by psychiatrist Roger Sparhawk, M.D. in connection with Evers's complaints of anxiety, depression, and ADHD. (R. 441-42, 573-74) The doctor reviewed Evers's past records of medication treatment and interviewed Evers, arriving at diagnoses including "[p]robable recurrent major

depression, . . . currently of moderate to severe or severe degree, in the context of relationship breakup"; panic disorder and ADHD, "by history"; "[m]ixed personality features"; and a current GAF "[e]stimated at 50 with serious symptoms." (R. 442, 574)  The doctor prescribed an increased dosage of Zoloft, and switched Evers from Klonopin to Xanax based on Evers's report that Klonopin was less effective in controlling his panic attacks, and caused him more sedation than Xanax. (*Id.*)

Evers saw Dr. Sparhawk for follow-up on June 10, 2005.  Notes indicate Evers was "showing some improvement on the current regimen," so his medications were continued without change.  His GAF was estimated to be "55 with moderate symptoms." (R. 440, 572)  Evers saw the doctor again on July 15, 2005, and notes indicate he was showing "some significant improvement" on his current medications.  Nevertheless, his GAF was estimated to be "50 with serious symptoms." (R. 439, 571)

On July 20, 2005, James Alsdurf reviewed the record and completed a Psychiatric Review Technique form. (R. 419-32)  He found Evers to have no medically-determinable psychiatric impairment, noting Evers "gets around town, goes to the library often to read.  Does some things around the house, has his kids every other weekend."  He also noted Evers had not "kept any of his [appointments] with mental health practitioners, but had kept appointments with his primary care physician. (R. 431)

On July 21, 2005, Daniel Larson reviewed the record and completed a Physical Residual Functional Capacity Assessment form. (R. 456-63)  He opined Evers could lift twenty-five pounds frequently and fifty pounds occasionally; and sit, stand, and/or walk for six hours in an eight-hour workday, with normal breaks.  He found Evers to have no physical limitations of any kind. (*Id.*)  On January 4, 2006, Charles T. Grant reviewed the record and concurred in Larson's findings. (R. 465-66)

Evers saw Dr. Sparhawk for follow-up on August 16, 2005. He complained of "ongoing/persistent excessive daytime sleepiness despite consistently using CPAP every night." (R. 437, 569) He described his mood as "up and down," and he was frustrated with his life situation and his ongoing divorce proceedings. His current GAF was estimated to be "50 with moderate symptoms." (*Id.*) His medications were continued without change. (*Id.*)

At his next appointment on September 13, 2005, Dr. Sparhawk prescribed a trial of Provigil, and decreased Evers's Adderall dosage, in an attempt to address his daytime sleepiness. His GAF was assessed "at 50-55 with moderate to serious symptoms." (R. 435, 567) On October 17, 2005, Evers reported that the Provigil was "helpful with his daytime alertness." His GAF was estimated to be "50 with moderate to serious symptoms." (R. 434) His medications were continued without change. (R. 433-34, 565-66)

On January 5, 2006, R. Owen Nelson, Ph.D. reviewed the record and completed a Psychiatric Review Technique form (R. 467-80), and a Mental Residual Functional Capacity Assessment form (R. 481-84). Dr. Nelson concluded that Evers "appears to have a severe psychological impairment that does not meet/equal the listings." (R. 479) He noted the following regarding Evers's work-related mental abilities:

> The claimant[] retains the capacity to concentrate on, understand, and remember routine, repetitive tasks, and three and four step, uncomplicated instructions, but would have moderate problems with detailed, and marked problems with complex, instructions.

> The claimant's ability to carry out tasks with adequate persistence and pace would be intact for routine, repetitive, or three and four step tasks, but moderately impaired for detailed and markedly impaired for complex tasks.

> The claimant's ability to interact and get along with co-workers would not b[e] significantly impaired.

The claimant's ability to interact with the public would not be significantly impaired.

The claimant's ability to follow an ordinary routine would be moderately impaired, but adequate to function with the ordinary level of supervision found in most customary work settings.

The claimant's ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive and a three and four step work setting.

(R. 483)

Evers saw Dr. Sparhawk for follow-up on February 3, 2006. Evers had run out of his Adderall and Provigil, and had missed appointments due to car troubles. He reported feeling more depressed since running out of his medications. He described his mood as "antsy and a little depressed." (R. 563) His GAF was estimated to be "50 with moderate to serious symptoms." (*Id.*) His medications were continued, with "a slightly higher dose of Adderall in an attempt to control the attention and concentration better." (R. 564)

Evers returned to see Dr. Sparhawk on March 8, 2006. He felt his attention span was improved and he was less fidgety with the increased Adderall dosage. His medications were listed as "helpful and well-tolerated." (R. 561) Evers continued to complain of excessive daytime sleepiness. (*Id.*) His GAF was unchanged at "50 with moderate to serious symptoms." (R. 562)

Evers next saw Dr. Sparhawk on April 5, 2006. (R. 559-60) He reported some ongoing fatigue, and stated Provigil was no longer helping for this. The Provigil was discontinued, and the doctor prescribed Wellbutrin XL, "potentially [a] more energizing antidepressant [that] might possibly either replace Zoloft or augment it." (R. 560) His GAF was unchanged at "50 with moderate to serious symptoms." (*Id.*) When Evers returned on April 27, 2006, he felt he was somewhat improved

on the Wellbutrin. His GAF also was improved at "55 with moderate symptoms." (R. 558) His medications were continued without change. (R. 557-58)

In May 2006, Evers was diagnosed with "mild to moderately severe bilateral sensorineural hearing loss." Hearing aids were prescribed. (R. 512, 516)

On May 26, 2006, Evers's Wellbutrin dosage was increased and Zoloft dosage was decreased. (R. 556[5]) Evers saw Dr. Sparhawk for medication management on June 21, 2006. He indicated his medications were helpful and well-tolerated, and they were continued without change. His GAF was estimated to be "55 with moderate symptoms." (R. 554-55) On August 31, 2006, Evers requested to lower his dosage of Wellbutrin and increase his dosage of Zoloft. He had been "down somewhat more the past 6-8 weeks," and continued to "report fairly severe attention and concentration and hyperactivity symptoms on the Barclay Questionnaire." (R. 552) His GAF was unchanged at "55 with moderate symptoms." (R. 553) The doctor changed the dosages as requested, and on November 15, 2006, Evers reported that he was doing better on those dosages. His GAF continued to be estimated at "55 with moderate symptoms." (R. 550) The doctor further deceased the Wellbutrin dosage. (R. 550-51) Evers continued to report doing well at his next visit on January 18, 2007, and his GAF was unchanged at "55 with moderate symptoms." (R. 548-49) On March 15, 2007, Evers reported that his mood was "so-so to pretty good and mostly even," and he was sleeping eight hours per night. His GAF assessment continued to be 55, and his medications were continued without change. (R. 546-47)

At Evers's medication management visit on April 12, 2007, he reported that he was seeking care closer to home. His GAF continued to be 55, and his medications were

---

[5] This is page 2 of the record from May 26, 2006. (R. 556) Page 1 does not appear in the Record.

continued without change, including Zoloft, 150 mg per day; Wellbutrin SR, 100 mg per day; Adderall, 10 mg twice a day; Xanax, 1 mg twice a day; and Glucotrol. (R. 544-45)

In June 2007, Evers began having knee pain. He was seen in the emergency room and was give a knee immobilizer and crutches. A follow-up MRI of his knee showed "abnormalities of the menisci," and degenerative changes, and he was referred to an orthopedic specialist. (R. 520-21)

On July 9, 2007, Evers was seen by a psychiatrist for medication management. His mood was noted to be euthymic, with no anxiety, and good attention and concentration. Notes indicate Evers's wife was receiving disability payments and "they basically [were] living off her disability." (R. 504) Evers stated he could function "okay" unless he was in a "really big crowd," and he reported no panic attacks. He was on crutches from a torn knee cartilage. His current GAF was estimated to be 50, and his psychiatric medications were continued without change. (R. 505)

On September 24, 2007, Evers was seen for evaluation at the clinic where he was receiving medication management. (R. 490-503) Evers's diagnoses were listed as Major Depressive Disorder, Recurrent, Moderate; and Anxiety Disorder, NOS. His current GAF was estimated at 55. (R. 490) The doctor recommended he continue with medication management, and also begin individual therapy with a focus on relaxation techniques and positive coping skills. (R. 492) Notes indicate Evers had a notable facial tic that lessened somewhat as the interview continued. (R. 493, 502)

On January 22, 2008, Evers was seen to begin individual therapy with Michelle L. Buhman-Livermore, LISW. Evers reported that his current medication regimen was working well for him. His GAF was estimated to be 55. He agreed to begin seeing the counselor for "cognitive therapy and problem-solving therapy, as well as interpersonal therapy that might help him improve his ability to communicate with friends and family." (R. 591)

Evers saw the counselor for therapy sessions on February 7 and 21, 2008. Evers reported that he had become involved in a neighborhood church as a mentor for the youth group. His medications continued to work well for him and his symptoms were stable. He was anxious and frustrated by the denial of his disability application, and fearful about his finances and the future. (R. 592-93)

### 3. *Medical expert's testimony*

The ME stated Evers has, "from time to time," met the A criteria for a major depressive disorder under Listing 12.04. He has a panic disorder under Listing 12.06 "by history," but the ME found no "clear elucidation of what those symptoms are" beyond Evers's hearing testimony. (R. 612) The ME further noted the record suggests Evers has a personality disorder not otherwise specified under Listing 12.09. (R. 613)

With respect to the degree of limitations that these impairments would cause Evers, the ME rated them as mild with respect to the activities of daily living, moderate with respect to maintaining social functioning, and moderate with respect to maintaining concentration, persistence, and pace, with no episodes of decompensation. (*Id.*) The ME opined Evers would be restricted to "simple, repetitive, routine kinds of tasks . . . that involve only brief and superficial contact with others." (*Id.*) The ME indicated these restrictions "would require that [Evers] be able to tolerate at least minimal amounts of stress," which is "hard to define in a work environment." (R. 614)

With regard to Evers's claim that he experiences anxiety attacks several times a day, the ME indicated that whether or not these attacks would interfere with Evers's ability to work "depends on the extent of the anxiety attacks in terms of the . . . degree to which it impairs his functioning at the time." (*Id.*) The ME observed:

> Some people have anxiety attacks that they can work through on and, and you wouldn't know that they're having them, for some other people it effects [sic] them

very differently. From the records I don't have any, the diagnosis of a panic disorder was made by history and it sounds like they felt that that was under reasonably good control over the last few years, but that's in contradiction to what [Evers] said this morning.

(R. 614-15)

### 4.     Vocational expert's testimony

The ALJ asked the VE if Evers could return to any of his past relevant work "if he were limited to work that should not be any more exertional than light but would be simple and unskilled and superficial contact at best with the public and fellow employees, [with] minimum stress[.]" (*Id.*) The VE indicated Evers could return "[p]ossibly" to "the assembly jobs," with permitted absenteeism of one day per month. (R. 615-16) If Evers were unable to maintain "productive speed," then he "would be subject to criticism" by his supervisors. (R. 616)

### 5.     The ALJ's decision

The ALJ found that Evers has severe impairments consisting of diabetes, sleep apnea, major depressive disorder, anxiety, and attention deficit hyperactivity disorder, the combination of which would "more than minimally" affect his ability to work. (R. 25) However, the ALJ concluded that Evers's impairments, singly or in combination, did not meet the Listing level of severity. (R. 26)

The ALJ further found, based on the ME's testimony, that Evers's panic disorder and personality disorder were not medically-determinable mental impairments. (R. 25) He further found Evers's treatment for his upper extremity numbness and pain did not result in significant work-related

limitations for a twelve-month period, and therefore they also were not severe impairments.  (R. 26)

The ALJ found as follows regarding Evers's GAF scores:

> The record contains numerous Global Assessment of Functioning Assessments (GAF) between June 2002 and September 2007, which indicate that the claimant's difficulty in social functioning ranged between only mild difficulties to serious impairments.  The claimant's GAF was assessed at 45 to 50 in December 2004 and 45 in February 25 [sic], reflecting serious impairments in social functioning.  <u>The Diagnostic and Statistical Manual of Mental Disorders</u>, 32 (4th ed. 1994) However, the GAF score as used in the DSM-IV was intended to be used for diagnostic purposes and not for making determinations related to disability.  Further, these GAF assessments reflect the claimant's functioning at one point in time and do not represent the claimant's functioning over an extended time period. The record reveals that the majority of GAF assessments have ranged between 50 to 55, indicating essentially moderate limitations in social functioning. During the first year after his alleged onset date the claimant's GAF ranged between 60 and 66, reflecting only mild symptoms, and GAF assessments of 55 beginning in June 2006 reflect moderate limitations in social functioning.  [Citation to exhibits omitted.]  The undersigned finds that overall the claimant is subject to no more than moderate limitations in social function.

(R. 27)

The ALJ found Evers "has the residual functional capacity to perform the full range of light work, requiring lifting twenty pounds occasionally and ten pounds frequently, standing/walking six hours in an eight-hour day and sitting two hours in an eight-hour day.  The claimant is limited to simple, unskilled work with superficial contact at best with the public

and fellow employees." (R. 28) In reaching this conclusion, the ALJ noted he had considered third-party observations of Evers's friends, Dana Lee and Michael Alan Junker. Lee indicated on December 26, 2005, that she saw Evers three times a week for an hour or two at a time, and she had known him for two years. She noted Evers "doesn't care what he looks like" and "needs to be reminded" to bathe, shave, and care for his hair. (R. 259-60) She indicated Evers picks up his residence, but he needs prompts to complete tasks, and cleaning the apartment will take him several days. (R. 260) She noted Evers "does not like to be alone, or in public for a long time." (R. 262) He goes to church and out to coffee with friends one to three times a week. According to Lee, Evers's "arms and hands go numb a lot, [and] depression effects [sic] ability to think, concentrate, complete anything." (R. 263) She indicated Evers is unable to follow written instructions well, having to read and re-read them, and ask questions repeatedly to be sure he is doing something correctly. (*Id.*) She stated that when Evers encounters stress, his "anxiety goes threw [sic] the roof." (R. 264) She observed that Evers fears dying in his sleep, thinks people are watching him all the time, and exhibits "nervous shaking of leg." (*Id.*)

Junker indicated on June 14, 2005, that he spent a couple of hours a week visiting with Evers. He described Evers's daily activities as watching television, and occasionally going to the library to read newspapers and magazines and check his email. Junker also stated Evers has to be reminded to tend to his personal hygiene and put on clean clothes. (R. 237-38) He also stated a friend calls Evers to remind him to take his medications. (R. 238) Junker stated Evers does his own laundry, dishes, and mowing as needed, but these tasks take him quite awhile to complete, and Evers limits these activities because they cause pain in his arms. (R. 238-39) According to Junker, Evers has exhibited increasing difficulty sitting still and concentrating on what he is doing. (R. 240)

The ALJ found these observations by Evers's friends "to be sincere, well-intentioned, and essentially consistent with [Evers's] asserted limitations," but the ALJ gave greater weight to the medical evidence of record, which he found supported his assessment of Evers's residual functional capacity. (R. 29)  He noted that the lifting limitations in his RFC are consistent with Evers's testimony that he is able to lift twenty pounds. (R. 30)

The ALJ found Evers's subjective statements regarding the intensity, persistence, and limiting effects of his impairments not to be fully credible. He noted Evers "testified that he quits a job when he gets bored, which strongly suggests that his frequent job losses are not due to any medically documented mental impairment but rather are due to his own life choices." (R. 32)  He also observed that Evers "has performed work at the substantial gainful activity level during just three years, in 1992, 1994, and 1996," reflecting a less-significant motivation to return to work. (*Id.*)  The ALJ noted Evers has not reported any adverse side effects from his medications, and his daily activities are "inconsistent with a finding of disability." (*Id.*)

The ALJ considered Evers's subjective complaints in arriving at his RFC. He limited Evers to simple, unskilled work at the light exertional level based on Evers's testimony regarding his daytime fatigue due to sleep apnea, and his medically-documented diabetes.  He "further reduced the residual functional capacity to incorporate limitations relating to [Evers's] mental impairments." (R. 30)  The ALJ did not adopt the opinions of the medical consultants, who limited Evers to work at the medium exertional level, instead reducing the RFC "to accommodate the effects of [Evers's] subjective complaints." (*Id.*)  The ALJ gave great weight to the opinions of the ME, "who is familiar with disability program requirements and had the opportunity to review the medical evidence of record and hear the claimant's testimony." (*Id.*)

The ALJ concluded that Evers has the RFC to return to his past relevant work as an assembler, and he therefore is not disabled. (R. 32)

Docket no. 16.

Upon review of the record, and absent any objections to Judge Zoss's factual findings, the court adopts all of Judge Zoss's factual findings.

## II. LEGAL STANDARDS

The court reviews the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see* Fed. R. Civ. P. 72(b) (stating identical requirements); N.D. IA. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and recommendation). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court *may* review *de novo* any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files

an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

*De novo* review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting *de novo* review is "distinct from any form of deferential review"). The *de novo* review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while *de novo* review generally entails review of an entire matter, in the context of § 636 a district court's *required de novo* review is limited to "*de novo* determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any *issue* need only ask." (emphasis added)). Consequently, the Eighth Circuit Court of Appeals has indicated *de novo* review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger *de novo* review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district

court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit has been willing to "liberally construe[]" otherwise general *pro se* objections to require a *de novo* review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise, *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require *de novo* review, it is clear to this court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, this court will strive to provide *de novo* review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give *de novo* review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting *de novo* review with "clearly erroneous standard" of review, and recognizing *de novo* review was required because objections were

filed). The court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than *de novo* is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* Fed. R. Civ. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the court believes one further caveat is necessary: a district court always remains free to render its own decision under *de novo* review, regardless of whether it

feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.[6]

---

[6] The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the plain error standard appears to be discretionary, as the failure to file objections technically waives the appellant's right to appeal factual findings, *see Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report and recommendation will *not* result in a waiver of the right to appeal '"when the questions involved are questions of law or mixed questions of law and fact."'" (quoting *Francis v. Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed *de novo*, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See, e.g.*, *United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this
(continued...)

Evers has objected to several of Judge Zoss's findings. Although the court will review these findings, *de novo*, and Judge Zoss's other findings for clear error, the court reviews the Commissioner's decision to determine whether the correct legal standards were applied and "whether the Commissioner's findings are supported by substantial evidence in the record as a whole." *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir.1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir.1998). Under this deferential standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Page*, 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion.") (quoting *Haggard*, 175 F.3d at 594). Even if the court would have "'weighed the evidence differently,'" the Commissioner's decision will not be disturbed unless "it falls outside the available 'zone of choice.'" *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (quoting *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)).

### III.  LEGAL ANALYSIS

In his objections, Evers challenges Judge Zoss's finding, and subsequent recommendation, that there is substantial evidence in the record to support the ALJ's determination that Evers is capable of performing past relevant work as an assembler.

---

[6](…continued)
one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions *de novo*." (citation omitted)).

Specifically, the ALJ found that Evers has the residual functional capacity to perform the full range of light work, requiring lifting twenty pounds occasionally and ten pounds frequently, standing or walking six hours in an eight-hour day and sitting two hours in an eight-hour day and is limited to simple, unskilled work with superficial contact at best with the public and fellow employees. Evers objects to the Judge Zoss's finding because: (1) the ALJ failed to adequately analyze Evers's GAF score history as noted by his treating providers; (2) the ALJ failed to give appropriate weight to the opinion of Evers's treating doctors; (3) the ALJ erroneously discounted Evers's credibility; and (4) the ALJ failed to adequately examine the vocational expert.

## A. *GAF Assessments*

Judge Zoss recommended that the ALJ's decision, that Evers is not disabled under the Social Security Act, be affirmed. Specifically, Judge Zoss agreed with the ALJ that, in light of his GAF history between 2002 and 2007, Evers is subject to "no more than moderate limitations" in social functioning. Evers contends that he should be considered to suffer "serious limitations" because he was rated at below 50 in GAF assessments on multiple occasions. The ALJ acknowledged Evers's low GAF ratings. However, the ALJ found that the majority of the GAF ratings only indicated moderate limitations in social functioning.

The Fourth Edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) adopts an assessment on five axes purporting to help the clinician plan treatment and predict outcome. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 701-706 (4th ed. text rev. 2000) ("DSM-IV-TR") at 27. Global Assessment of Functioning ("GAF") is the last of the five axes included in the DSM-IV multiaxial classification. The GAF score represents "the clinician's judgment of

the individual's overall level of functioning." *Id.* at 32. The manual explains the methodology of GAF:

> The GAF score is divided into 10 ranges of functioning. [7] Making a GAF rating involves picking a single value that best reflects the individual's overall level of functioning. The description of each 10-point range in the GAF scale has two components: the first part covers symptom severity, and the second parts covers functioning. The GAF rating is within a particular decile if either the symptom severity or the level of function falls within the range. . . . It should be noted that in situations where the individual's symptoms severity and the level of functioning are discordant, the final GAF rating always reflects the worse of the two.

*Id.* at 32-33.

The manual advises caution in the use of DSM-IV:

> In DSM-IV, there is no assumption that each category of mental disorder is a completely discrete entity with absolute boundaries dividing it from other mental disorders or from no mental disorder. . . . the clinician using the DSM-IV should therefore consider that individuals sharing a diagnosis are likely to be heterogeneous even in regard to the defining features of the diagnosis and that boundary cases will be difficult to diagnosis in any but a probabilistic fashion. . . . It is important that DSM-IV not be applied mechanically by untrained individuals. The specific diagnostic criteria included in DSM-IV are meant to serve as guidelines to be informed by

---

[7] The relevant GAF scales under the DSM-IV are: 51-60 moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers); 41-50 serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job).

> clinical judgment and are not meant to be used in a cookbook fashion . . . there are significant risks that diagnostic information will be misused or misunderstood. These dangers arise because of the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis. In most situations, the clinical diagnosis of a DSM-IV mental disorder is not sufficient to establish the existence for legal purposes of a . . . "mental disability". . . .

*Id.* at xxxi-xxxiii.

Notwithstanding the DSM-IV manual's caution concerning the applicability of GAF scores in the legal realm, courts should consider a claimant's GAF scores when determining his or her disability:

> Pursuant to final rules of the Social Security Administration, a claimant's GAF score is not considered to have a "direct correlation to the severity requirements." 66 Fed.Reg. 50746, 50764-65 (2000). However, the rules still note that the GAF remains the scale used by mental health professionals to "assess current treatment needs and provide a prognosis." *Id.* As such, it constitutes medical evidence accepted and relied upon by a medical source and must be addressed by an ALJ in making a determination regarding a claimant's disability. Although the ALJ "may properly accept some parts . . . he must consider all the evidence and give some reason for discounting the evidence he rejects." *Adorno v. Shalala*, 40 F.3d 43, 48 (3rd Cir. 1994).

*Colon v. Barnhart*, 424 F.Supp.2d 805, 812 (E.D. Pa. 2006); *see also Halverson v. Astrue*, 600 F.3d 922, 930-31 (8th Cir. 2010) ("While . . . the Commissioner has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs, the GAF scores may still be used to assist the ALJ in assessing the level of a claimant's functioning.").

In this case, the record reveals the following GAFs for Evers:

| Date | GAF |
|------|-----|
| July 3, 2001 | 72 |
| January 31, 2002 | 72 |
| April 1 | *Evers's alleged disability onset date |
| June 25 | 66 |
| November 7 | 60-65 |
| September 19, 2003 | current 53; highest last year 62 |
| December 30, 2004 | current 45-50; last year unknown |
| February 3, 2005 | current 45, last year unknown |
| May 20 | 50 with serious symptoms |
| June 10 | 55 with moderate symptoms |
| July 15 | 50 with serious symptoms |
| August 16 | 50 with moderate symptoms |
| September 13 | 50-55 with moderate to serious symptoms |
| October 17 | 50 with moderate to serious symptoms |
| February 3, 2006 | 50 with moderate to serious symptoms |
| March 8 | 50 with moderate to serious symptoms |
| April 5 | 50 with moderate to serious symptoms |
| April 27 | 55 with moderate symptoms |
| June 21 | 55 with moderate symptoms |
| August 31 | 55 with moderate symptoms |
| November 15 | 55 with moderate symptoms |

| March 15, 2007 | 55 |
| April 12 | 55 |
| July 9 | 50 |
| September 24 | current 55; highest last year unspecified |
| January 22, 2008 | 55 |

The ALJ found that Evers is subject to "no more than moderate limitations on social function" in light of Evers's GAF chronology. The ALJ reasoned that:

> The claimant's GAF was assessed at 45 to 50 in December 2004 and 45 in February 25[8], reflecting serious impairments in social function . . . . The record reveals that the majority of GAF ranged between 50 to 55, indicating essentially moderate limitations in social functioning. During his first year after his alleged onset date the claimant's GAF ranged between 60 and 66, reflecting only mild symptoms, and the GAF of 55 beginning in June 2006[9] reflect moderate limitations in social functioning.

R. at 27.

The below graph tracks the same series of data as listed in the table above. The Y-axis representing the GAF rating and the X-axis the evaluation date. Evers's GAF scores are represented by the dots connected by the solid curve. The dotted parabolic

---

[8] The record indicates that Evers was assessed at 45 on February 3, 2005, rather than on February 25, 2005, as the ALJ noted. R. at 508.

[9] The record indicates that Evers was rated at 55 as early as April 27, 2006, rather than June 2006 as the ALJ noted. R. at 558.

curve represents the best fit curve derived from a regression analysis of Evers's GAF ratings.[10]



---

[10]  The equation for the best fit curve is:
Y(X)=5286837.531+(-5271.495361)*X+1.31406201*X^2.

The ALJ's observation is supported by Evers's raw GAF scores and the regression analysis thereof. As the graph above demonstrates, the solid line representing the raw data shows that Evers was rated at 70s and 60s prior to 2003. The downward trend began in 2002, when the ratings plummeted from the highest level at 72 in early 2002 to the lowest point at 45 toward the end of 2004 and early 2005. Since May 2005 through 2008, all of the nineteen ratings ranged between 50 and 55. Among the nineteen ratings, only eight of them are 50s—the majority of the 50s occurred between May 2005 and April 2006, interrupted by ratings over 50 twice in 2005. By contrast, there are eleven 55s since June 2005 through 2008; there are nine 55s in a row from April 2006, with only one exception in July 2007. Thus, the ALJ's observation is consistent with Evers's raw GAF scores.

Additionally, the regression analysis of Evers's GAF series also supports the ALJ's finding that Evers's GAFs indicate his social function was only moderately limited. The curve that best fits the distribution of Evers's GAF (represented by the dotted parabola) hangs completely above 50, indicating a GAF trend that Evers suffers no more than moderate symptoms or moderate difficulty in social, occupational, or school functioning. Therefore, to the extent that the ALJ found that Evers suffers no more than moderate limitation in social functioning in light of his GAF scores, the ALJ's opinion is supported by substantial evidence.

Evers objects to the ALJ's finding based on the significance of his GAF scores on various grounds. First, Evers notes that between 2004 and 2007, his GAF scores were 50 or below on ten separate occasions. However, Evers did score higher than 50 on ten other occasions within the same time frame. This being said, rather than cherry-picking certain combinations of scores that favors one side or the other, the better explanation is that whether the overall trend represented by the combination of the ten scores over 50 and by ten other scores below 50 indicates serious symptoms or moderate symptoms is an open

question without further analysis. In this case, the 50s occurred mostly during the one-year period between May 2005 and April 2006, interrupted twice by scores over 50. Since April 2006, Evers's GAF was quite consistently rated at a level of 55 during the two-year period, with only once going back to 50 in 2007. Overall, when Evers was rated in the 50s from May 2005 through April 2006, his mental condition was actually improving from the bottom of 45 to a robust level of 55 that lasted for two years. Thus, to the extent that the ALJ refused to find severe limitation based on Evers's scores of 50, the ALJ's opinion is supported by substantial evidence.

Next, Evers argued that "a score of 50" is more serious than the ALJ's findings indicate because the DSM-IV specifies that a GAF of 41 to 50 means serious symptoms. However, nothing in the ALJ's opinion indicates that the ALJ believes that a score of 50 means anything other than serious symptoms. Rather, the ALJ correctly noted that despite a combination of 50s between 2005 and 2007, when considered together with his higher scores prior to 2004, lower scores around 2005, and the multiple 55s after 2006, Evers's overall GAF trend indicates he did not suffer serious limitations.

Finally, Evers's reliance on *Pate-Fires v. Astrue*, 564 F.3d 935 (8th Cir. 2009) is misguided. In *Pate-Fires*, the ALJ discredited the treating psychiatrist's opinion that the claimant was not capable of participating in gainful employment because another physician accessed the claimant's GAF at 58. *Id.* at 943. The court held that the ALJ erroneously disregarded the treating physician's opinion based on one GAF score of 58 where the claimant's overall GAF scores indicated that the claimant had serious symptoms or serious impairments in social, occupational or school functioning. The claimant's GAF was above 50 only four out of twenty-one times in a six-year period. Moreover, the ALJ improperly ignored the many ratings below 50.

In stark contrast, Evers's GAF scores delineated an entirely different trend from that of *Pate-Fires*. From 2001 through 2008, Evers scored at 50 or above twenty-three times and at below 50 only twice. Even if we accept Evers's suggestion that the 50s be lumped together with the 40s, Evers scored at above 50 sixteen times while at 50 or below only ten times. The solid curve in the following graph clearly demonstrates that the GAF values in *Pate-Fires* are predominantly below 50. Moreover, the best fit curve (the dotted parabola) for the GAF series also indicates that the overall trend of Pate-Fire's GAFs falls below 50. Thus, even though the GAFs in *Pate-Fires* supported a finding of serious limitation, nothing in *Pate-Fires* lends support to Evers's contention that his GAF values also indicate serious limitation.



For the above reasons, the court finds substantial evidence in support of the ALJ's finding that Evers is subject to moderate limitations in social functioning.

## B. Physician Opinions

The ALJ refused to give Dr. Koss's opinion made on February 3, 2005, controlling weight, because the overall evidence does not support it. R. at 31. Judge Zoss found that the ALJ conducted a very thorough, thoughtful evaluation of the medical evidence, and that the ALJ gave appropriate weight to the opinions of Evers's treating physicians. Evers objects to this finding, arguing that the ALJ failed to assign proper weight to Dr. Koss's favorable assessment. Evers also claims that the ALJ and Judge Zoss improperly required that Evers's inability to work last for a period of twelve months or longer.

A treating physician's opinion is normally entitled to great weight. *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000) (citing *Rankin v. Apfel*, 195 F.3d 427, 430 (8th Cir. 1995)). However, such an opinion does not automatically control, since the record must be evaluated as a whole. *Id.* (citing *Bentley v. Shalala*, 52 F.3d 784, 785-86 (8th Cir. 1995)). An ALJ must always give good reasons for the particular weight given to a treating physician's evaluation. *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ's decision to discount or even disregard the opinion of a treating physician should be upheld when other medical assessments are supported by better or more thorough medical evidence. *Id.* at 1014 (citing *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997)).

On February 3, 2005, Dr. Koss noted that Evers was "unable to do gainful employment at this time." R. at 508. The ALJ need not defer to Dr. Koss's opinion because whether a claimant can do substantial gainful activity is an issue solely for the ALJ. *See Nelson v. Sullivan*, 946 F.2d 1314, 1316 (8th Cir. 1991). Dr. Koss also assessed Evers's GAF at 45, indicating serious limitations. However, none of the

subsequent nineteen GAF scores rated from 2006 through 2008, fall below 50. Notably, Evers was assessed at 45 only once throughout the entire six-year period—he was assessed at 55 only four months later on June 10 of the same year and on nine other subsequent occasions through 2008. As the first graph demonstrates, Evers might have experienced his worst symptoms in February 2005 as observed by Dr. Koss. However, the record as a whole unequivocally indicates an upward trend following Dr. Koss's evaluation.

Evers cites to the "GAF assessments of 50 on numerous occasions" by other physicians to support his position that Dr. Koss's diagnosis associated with his GAF assessment of 45 should have been given more weight than was given by the ALJ. Statistically, however, multiple 50s following only one assessment of 45 actually lend more support to the conclusion that Evers's condition, observed by Dr. Koss on February 3, 2005, was probably an irregularity—that entitled the ALJ to "not give this opinion great weight"—than to Evers's insinuation that Dr. Koss's opinion should be more representative of Evers's overall mental condition than the ALJ's opinion. Thus, to the extent that the ALJ discounts Dr. Koss's diagnosis, the court finds that the ALJ's opinion is supported by substantial evidence.

The ALJ and Judge Zoss both noted that the record indicates that Evers's inability to work did not last for a period of twelve or months or longer. R. at 31; docket no. 16 at 38. Evers alleges that the ALJ and Judge Zoss misconstrued the law regarding the twelve month requirement. Docket no. 17 at 12 (citing *Singletary v. Brown*, 798 F.2d 818 (5th Cir. 1986)). According to *Singletary*, the duration requirement applies only to impairment, not to inability to work. *See Singletary*, 798 F.2d at 821. However, in *Barnhart v. Walton*, 535 U.S. 212, 217-25 (2002), the Supreme Court upheld the Social Security Administration's interpretation of the duration requirement, which requires that "inability to engage in any substantial gainful activity" must be one that "has lasted or can

be expected to last . . . not less than 12 months." *Walton*, 535 U.S. at 217. Thus, the ALJ and Judge Zoss correctly applied the law regarding the duration requirement.

## C. Credibility Analysis

The ALJ found that Evers's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," but that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." R. at 30. Evers maintains that the ALJ erred because substantial evidence does not support the ALJ's credibility finding.

When the ALJ evaluates the claimant's subjective complaints, the ALJ must consider "the claimant's prior history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010) (citing *Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir. 2009) in turn citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). The ALJ is not required to discuss each factor as long as he acknowledges and considers the factors before discounting a claimant's subjective complaints. *Id.* at 932 (citing *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005)). The ALJ may also consider the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence. *Id.* at 931-32 (citing *Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008)). If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination. *Id.* at 932 (citing *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008)). The court has also held that acts which are inconsistent with a claimant's assertion of

disability reflect negatively upon that claimant's credibility. *Id.* at 932 (citing *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009)). The ALJ may also discount a claimant's subjective complaints if there are inconsistencies in the record as whole. *Halverson*, 600 F.3d at 932 (citing *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008)).

In this case, the record contains several inconsistencies as to Evers's disability. Evers reported that he "can read 2 to 4 books and is likely to spend long hours on his computer. At times he will not shut it off until 2 to 4 a.m. and then go to bed. Most of his computer time is spend [sic] playing games." R. at 322. According to Evers, he would go out for coffee with friends, check emails, and attend karaoke events at a local club. R. at 611-12.

Evers's subjective complaints are also inconsistent with the record as a whole. According to Dr. Felling and the Disability Determination Services psychological consultants, Evers is capable of performing routine, repetitive, three and four step work tasks. R. at 30. Moreover, Evers's overall GAF chronology suggests that he is subject to no more than moderate limitations in social functioning. R. at 27. The record also indicates that Evers's symptoms have waxed and waned but have overall improved with prescribed medication. R. at 31. Further, some of Evers's symptoms relate to situational anxiety, including a recent breakup with a girlfriend and issues with his former wife. *Id.* The ALJ found that Evers's past work activity prior to his alleged onset date did not reflect significant motivation to return to work. R. at 32. The ALJ also considered Evers's use of medications and the side effects from these medications. *Id.* Based on the ALJ's evaluation of Evers's daily activities, the objective medical evidence, and other inconsistencies as a whole, the court will not disturb the ALJ's decision to discount Evers's subjective complaints. *See Halverson*, 600 F.3d at 933.

### D. ALJ's Questions to the Vocational Expert

The ALJ found that Evers was able to perform his past relevant work. The ALJ relied on the VE's opinion in reaching this conclusion—the VE opined that a hypothetical individual of Evers's age, education, and past work experience, who was subject to the physical and mental impairments and restrictions the ALJ identified, could perform Evers's past job as an assembler. R. at 32. The following dialogue took place in Evers's hearing:

Q: Is there any past relevant work?

A: Yes, there is.

Q: Have you prepared any exhibits for this?

A: No, actually it's in the first file, it's on 11E, there's a vocational exhibit which has not changed since that time.

Q: Oh, okay.

A: It's included in those pages that are kind of folded together there at the very beginning.

Q: Okay. So if he were limited to work that should not be any more exertional than light but would be simple and unskilled and superficial contact at best with the public and fellow employees, minimums stress, could he return to any of this past relevant work?

A: Possibly the assembly jobs. He performed a number of different assembler positions over the year.

Q: And the permitted absenteeism from that?

A: One day a month.

Q: Okay.

R. at 615-16.

The ALJ must develop the record fairly and fully regardless of the claimant's burden to press the case due to the non-adversarial nature of the social security hearing. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007) (citing *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004)). If the ALJ seeks to rely on the testimony of the VE, the testimony must be given in response to a hypothetical question that accurately describes the claimant

in all significant, relevant respects. *Edwards v. Barnhart*, 383 F.Supp.2d 920, 927 (E.D. Mich. 2005) (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987)). The ALJ must enumerate the claimant's impairments and must include in his consideration allegations of pain and other non-exertional impairments. *Baugus v. Secretary of Health and Human Services*, 717 F.2d 443, 447 (8th Cir. 1983). If the ALJ excludes pain from the hypothetical, he must set forth his reasons for doing so. *Id.* The VE's response to a defective hypothetical question does not constitute substantial evidence. *O'Leary v. Schweiker*, 710 F.2d 1334, 1343 (8th Cir. 1983).

However, the claimant bears the initial burden of proving a disability. *Johnson v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994). If the claimant can show she is unable to perform past relevant work then the burden shifts to the Secretary to show that work exists that the claimant can perform. *Id.* at 452. To meet her initial burden of proof, the claimant must show that she has a "medically determinable impairment which precludes performance of previous work." *Id.* at 451 (citing *Turpin v. Bowen*, 813, F.2d 165, 170 (8th Cir. 1987)).

Evers contends that the ALJ's hypothetical question to the VE is flawed. Specifically, Evers points out that the ALJ failed to include the following areas in his hypothetical question to the VE: (1) his history of GAF scores at 50; (2) his anxiety and fatigue; (3) his poor hygiene; and (4) his lack of concentration. Judge Zoss agreed with Evers that the hypothetical question was deficient because "the ALJ did not set forth any of Evers's limitations." However, as Judge Zoss correctly pointed out, Evers failed to meet his initial burden of proof by showing the existence of a disability before the testimony of a VE is required. In this case, the ALJ explicitly found that Evers is capable of performing past relevant work as an assembler. R. at 32. Evers's overall GAF indicates no more than moderate limitations in social functioning. R. at 27. Moreover, Evers engages in a variety

of activities inconsistent with a finding of inability to perform his past relevant work, including caring for his three children every other weekend, preparing simple meals on a regular basis, checking his email, playing video games on the computer until 2:00 a.m., going to the library and doing normal household chores such as washing the dishes, doing the laundry, and mowing the lawn. R. at 27. Evers also testified that he enjoys going to karaoke at a local club. R. at 27. Evers reports a tendency to isolate himself—however, he testifies that he gets together with friends on a regular basis, attends church every week, goes to the library on a regular basis, spends time with his children every other weekend, and goes shopping two or three times a month. R. at 27. He does not report any problems getting along with family, friends, and neighbors and states he gets along well with authority figures. R. at 27. Mental examinations have generally found Evers alert and oriented, with normal and coherent thought processes. R. at 28. Evers indicates he reads two to three books a week with no problems, and he has not reported any problems concentrating on, understanding, or paying attention to the video games he plays on the computer. R. at 28. Evers is able to drive a car, pay his bills, and handle a checking and savings account. R. at 28. Finally, the ALJ has provided ample reasons for discounting Evers's subjective complaints, as they are inconsistent with the activities in which he admittedly engages and with the rest of the record. R. at 30-32. Thus, substantial evidence indicates Evers has not demonstrated that he cannot perform past relevant work. Consequently, the testimony of a VE is not required in the present case and, thus, is not a basis for overturning the Commissioner's decision. *See Johnson*, 42 F.3d at 452 (the burden does not shift to the ALJ to show that there are other works the claimant can perform if the claimant fails to show she is unable to perform her past relevant work).

### IV. CONCLUSION

THEREFORE, the court finds that the ALJ's determination that Evers is capable of performing his past relevant work as an assembler is supported by substantial evidence in the record as a whole. Judge Zoss recommended that the ALJ's decision be affirmed. The court agrees that the ALJ's decision should be affirmed and accepts Judge Zoss's Report and Recommendation (docket no. 16).

**IT IS SO ORDERED.**

**DATED** this 28th day of September, 2010.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA